UNITED STATES of America,
Plaintiff–Appellee,

v.

**Lennie Earl LETSINGER, Defendant–Appellant (Two Cases).**

**Nos. 95–5007, 95–5198.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 29, 1996.

Decided Aug. 22, 1996.

---

**ARGUED:** Kathleen Joanna Lynch Holmes, Murphy, McGettigan & West, P.C., Alexandria, Virginia, for Appellant. Leslie Bonner McClendon, Assistant United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Alexandria, Virginia, for Appellee.

Before HALL, NIEMEYER, and LUTTIG, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the majority opinion, in which Judge NIEMEYER joined. Judge HALL wrote a dissenting opinion.

## OPINION

LUTTIG, Circuit Judge:

Appellant, Lennie Earl Letsinger, challenges on two grounds the denial of his motion to suppress evidence obtained in connection with his arrest for possession with intent to distribute crack cocaine. First, he argues that his consensual questioning was transformed into a seizure by the movement of the train on which he and his arresting officers were traveling. Second, he contends that his bag containing the cocaine which he wishes suppressed was seized at the time that the officers announced they were going to seize it, and, at that time, they lacked reasonable suspicion to make such a seizure. We ultimately reject both arguments, and therefore affirm the judgment of the district court.

### I.

The material facts are not in dispute. J.A. at 134–38, 155–59. On September 14, 1994, members of a federal drug task force, "Operation Railtail," received information from Amtrak that Letsinger had purchased, with cash, a one-way train ticket from New York to Rocky Mount, North Carolina, and had provided Amtrak a "bad" call back number. J.A. at 134, 155. Three police officers boarded the train at Union Station in Washington, D.C., looking for Letsinger. The officers went to Letsinger's compartment and

knocked on the door, but there was no answer. They did not then enter his compartment, but rather left the train and waited on the platform for Letsinger to return. When an individual matching Letsinger's description boarded the train, the officers followed, and when they knocked on the door of his compartment a second time, Letsinger answered. The police identified themselves and asked Letsinger if they could speak with him, and Letsinger agreed. J.A. at 72, 135, 156. The officers remained in the hallway and Letsinger stood in the doorway to his compartment while the questioning took place, blocking access to his bag. J.A. at 73, 101, 135. Letsinger said he was on a "business" trip and would be in Rocky Mount for "a few days." J.A. at 73, 135, 156. About a minute into the questioning, the agents decided to ask the conductor to delay the train, but, before they could do so, the train departed Union Station. Continuing to question Letsinger, the agents asked for his identification. Letsinger became "very nervous" and "fumbled" through his wallet, taking three or four tries to remove his identification. J.A. at 74, 100, 136, 156.

The agents then asked Letsinger if he had any luggage, and he replied that he had one bag. They asked if they could search the bag. At this, Letsinger asked why he had been picked for questioning and whether he had to let them search, and Detective Ed Hanson replied, "we can only ask for your cooperation." J.A. at 76, 136. Letsinger responded that he had "personal papers" in the bag, and Detective George Darley said that they were not interested in papers. At that point, Hanson said to Letsinger that, based on the information they had, they were going to detain his bag, he could retrieve it later, and otherwise he was "free to do whatever he wanted to do." J.A. at 76, 104, 108, 137.

Notwithstanding his statement that the officers were going to detain Letsinger's bag, however, neither Hanson nor any of the officers took any steps toward the luggage. J.A. at 137. Instead, they continued to talk with Letsinger about his bag, asking him again if he would allow them to search the bag. To this request, Letsinger replied, "if you find a joint or some marijuana in the bag, I will be in big trouble." J.A. at 76, 137. Hanson responded that they were not particularly interested in small quantities of marijuana, which Letsinger said he had heard before. Hanson asked if that was why Letsinger was so nervous, because he had marijuana in his bag, and Letsinger said "yes." J.A. at 76–77, 109, 137. Upon hearing that Letsinger had marijuana in his bag, Hanson asked Letsinger to step out of the compartment. J.A. at 77, 137–38. Hanson then stepped into the compartment, searched Letsinger's bag, and found 2,969.46 grams of crack cocaine (but no marijuana). J.A. at 158.

Letsinger was arrested and, following the denial of his motion to suppress the evidence found in his bag, pleaded guilty to possession with intent to distribute, preserving his right to appeal the denial of his motion to suppress. He was then sentenced to 188 months in prison, and this appeal followed.

## II.

### A.

■ Letsinger argues first that, because no reasonable person would feel free to leave a moving train, his consensual conversation became a seizure when the train began to move and the officers remained on board questioning him. The holding in *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991), is dispositive of this claim:

> [T]he mere fact that [the defendant] did not feel free to leave the bus does not mean that the police seized him. [The defendant] was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. [The defendant's] movements were "confined" in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive.

Additionally, Letsinger was repeatedly told that he was only being asked for his "cooperation" and that he was "free to do whatever he wanted," J.A. at 76; as the district court found, "at no time did Letsinger indicate . . .

that he wanted to end the conversation, verbally or through his actions," J.A. at 136.

### B.

■ Letsinger next argues that his bag was seized at the time that the officers announced that they were going to detain it; that, at that time, they lacked reasonable suspicion to support detention of the bag; and, therefore, that the bag was illegally seized, requiring suppression of the cocaine. For the reasons that follow, we reject this contention, as well.

"From the time of the founding to the present, the word 'seizure' has meant a 'taking possession' ... [and] [f]or most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control." *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 1549–50, 113 L.Ed.2d 690 (1991) (citations omitted). Under this definition of "seizure," Letsinger's bag obviously was not seized upon the officers' mere announcement, because the common law required actual custody. But the common law may not necessarily end our inquiry.

In *Hodari D.,* in addressing whether a suspect fleeing from police was " 'seized' within the meaning of the Fourth Amendment" by virtue of the police pursuit, *id.* at 623, 111 S.Ct. at 1548, the Supreme Court identified two circumstances in which *a person* can be "seized" even though he is not actually brought under physical control. First, the Court concluded that a person is "seized" if he is touched by a police officer with lawful authority and purpose to arrest, even if that person is not subdued. In so concluding, the Court recognized, and indeed to some extent created, *id.* at 626 n. 2, 111 S.Ct. at 1550 n. 2, an exception to the general common law requiring the actual " 'taking [of] possession,' " *id.* at 624, 111 S.Ct. at 1549–50. Second, following its decision in *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), the Court also concluded that a person is "seized" under the Fourth Amendment upon the submission of that person to an official "show of authority." Focusing on this latter circumstance of seizure, and assuming *arguendo* that the police pursuit at issue there constituted a "show of authority," *Hodari D.,* 499 U.S. at 625, 629, 111 S.Ct. at 1550, 1552, the Court held that, "since Hodari did not comply" with that "show of authority," he was not seized "until he was tackled," that is, until he was physically touched, *id.* at 629, 111 S.Ct. at 1552.

*Hodari D.,* of course, specifically addressed the seizure of persons, *id.* at 627 n. 3, 111 S.Ct. at 1551 n. 3. However, in light of the Court's evolving views on the relevancy of common law in defining Fourth Amendment "seizures," it is at least plausible that either or both of *Hodari D.*'s two exceptions to the general common law requirement of actual custody for seizure—a physical touching without control or a complied-with show of authority—may ultimately be held to extend to objects as well as persons.

On the one hand, as *Hodari D.* itself noted, common law seizure of inanimate objects, like common law seizure of even most animate objects, occurred only upon the exercise of physical control over the object. *See Pelham v. Rose,* 76 U.S. (9 Wall.) 103, 106, 19 L.Ed. 602 (1869) ("[B]y the seizure of a thing is meant the taking of a thing into possession, the manner of which, and whether actual or constructive, depending upon the nature of the thing seized. As applied to subjects capable of manual delivery, the term means caption; the physical taking into custody."). There was no "mere touch" exception to this general rule, as there was for an arrest, "the quintessential 'seizure of the person,' " 499 U.S. at 624, 111 S.Ct. at 1550 . Likewise, the concept of seizure through a "show of authority," as in *Terry* and *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980), has never been expressly extended to objects.

But, on the other hand, the Court in *United States v. Jacobsen,* 466 U.S. 109, 113 & n. 5, 104 S.Ct. 1652, 1656 & n. 3, 80 L.Ed.2d 85 (1984), expressly stated that the definition of the seizure of an object as a "meaningful interference with ... [a] possessory interest[ ]" follows directly from the parallel definition of the seizure of a person, and it cited for this observation, *inter alia, Terry* 's defi-

nition of the seizure of a person as a restraint on liberty through "physical force or show of authority." *Cf. United States v. Place*, 462 U.S. 696, 702, 709, 103 S.Ct. 2637, 2641–42, 2645–46, 77 L.Ed.2d 110 (1983) (extending *Terry*'s "articulable suspicion" justification to the seizure of personalty from suspect's immediate custody and control and holding that "the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause"). And, once a suspect yields to an officer's show of authority over an object within the suspect's custody or control (or even once an officer touches an object), it is arguable that the suspect's possessory interests have been "meaningfully interfered" with to a sufficient degree to justify a conclusion that the object has been seized. Indeed, in direct response to a coercive, official assertion of entitlement to the object, he has surrendered his possessory interests altogether.

We need not decide today, however, whether *Hodari D.*'s two exceptions apply to the seizure of objects from one's immediate custody or control, because, even assuming that they do, we are satisfied that, under the circumstances before us, Letsinger's bag was not seized until the officers actually took it into their physical possession.

There is no claim that the officers touched or applied any physical force to the bag until they actually took possession of Letsinger's suitcase. Thus, Letsinger can only maintain that Detective Hanson's statement that he "was going to detain his bag," J.A. at 76, 104, constituted a show of authority sufficient to effect a Fourth Amendment seizure.

■ The general test for a show of authority is whether " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to ["decline the officers' requests or otherwise terminate the encounter"].' " *Hodari D.*, 499 U.S. at 628, 111 S.Ct. at 1551 (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877) (language in brackets from *Bostick*, 501 U.S. at 439, 111 S.Ct. at 2388–89; *see also United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir.), *cert. denied*, 510

U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 342 (1993)). In light of the Court's various applications of this test, we are by no means certain that the officers' actions here constituted a completed show of authority. The officers remained in the train's corridor, and they never drew their guns. *See Bostick*, 501 U.S. at 432, 111 S.Ct. at 2385 ("[A] fact[ ] . . . particularly worth noting[:] . . . at no time did the officers threaten [defendant] with a gun."). Their simple statement that they were "going to detain his bag" was calmly uttered during an ongoing, casual, consensual conversation. It was not phrased as an "order," *e.g.*, "give me your bag," or even as a present-tense declarative sentence, *e.g.*, "your bag is hereby seized." *See, e.g., Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (explaining that "use of language or tone of voice indicating that compliance with the officer's request might be compelled" is relevant to whether reasonable person would have believed he was free to leave). Moreover, even after stating that they were going to seize Letsinger's bag, the officers made no movement toward the bag. Instead, they continued to seek Letsinger's consent to search the bag, and Letsinger continued to engage the officers in a way that suggested that neither he nor the officers believed the officers' statement constituted a completed show of authority. Given that the Court in *Hodari D.* did not even hold that a full speed police pursuit was necessarily a show of authority, 499 U.S. at 625, 629, 111 S.Ct. at 1550, 1552, it is quite possible that this unadorned statement, in the context in which it was made, did not constitute a show of authority either.

■ But even assuming that the officers' statements collectively constituted a completed show of authority under *Mendenhall* and *Hodari D.*, a show of authority is only a "*necessary*, . . . not a *sufficient*, condition for seizure." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. at 1551–52. In addition, the suspect must *submit* to that show of authority in order for there to be a "seizure" according to those cases. Just as "yelling 'Stop in the name of the law!' at a fleeing form that continues to flee" is "no seizure," 499 U.S. at 626, 111 S.Ct. at 1550–51, so also yelling "I

seize your suitcase!" at a suspect who does not relinquish control is "no seizure." It was not at common law, and we perceive no reason why it should be today.

We recognize that in *Place* the Supreme Court, in passing, stated in *dictum* that the seizure occurred when the officer "told" the suspect, as here, that "he was going to take [his] luggage," 462 U.S. at 707, 103 S.Ct. at 2645, and in *McFarley* our circuit similarly stated that the voluntariness of McFarley's actions was broken when officers there "announc[ed]" that his bags were going to be detained, 991 F.2d at 1192. But in neither *Place* nor *McFarley* was the distinction between an announced intention to seize and the actual taking of the object into possession at all relevant. Neither case concerned a suspect who failed to yield to a show of authority; in both cases, the suspect yielded and the officers took physical possession of the bags immediately after announcing that they were going to do so, with nothing of constitutional import occurring in the interim. *See Place*, 462 U.S. at 699, 103 S.Ct. at 2640, *McFarley*, 991 F.2d at 1190–91. And in both *Place* and *McFarley* the bag was easily within reach of the officers; here, the defendant stood in the doorway directly between the officers in the hallway and the bag in the compartment. Moreover, *Place* was decided eight years before *Hodari D.*, and *McFarley* did not discuss *Hodari D.* at all. We therefore consider the most relevant analysis to be that in *Hodari D.*, the only one of these cases to consider, or even to have before it, the precise question of whether a seizure occurs upon its mere announcement, upon a subsequent yielding, or upon the application of physical force to the person or object.

Having concluded, on the assumption that it is possible for a show of authority to effect a seizure of an object, that *Hodari D.* requires that there be a submission to that show of authority, we do not attempt here to define the full contours of the required submission. At the very least, however, we believe that the suspect must clearly acquiesce to the officer's show of authority over the object in the suspect's possession. Here, Letsinger did not acquiesce to the officers' statement that they were going to retain the bag. At the time, the officers were standing in the corridor of the train, and the bag was in Letsinger's compartment, largely out of sight. Letsinger was standing in the doorway between the officers and the bag. Letsinger did not hand the officers the bag. He did not step out of the way to allow them access to the bag. Nor did he even verbally assent to their detention of it. Instead, he continued to try to dissuade the officers yet again from taking the bag, an attempt to which, as we noted, the officers appeared receptive.

We therefore hold that, assuming that a complied-with show of authority can constitute a "seizure" of an object from one's immediate custody or control, Letsinger's bag was seized only when the officers physically took possession of it, because Letsinger did not submit to the officers' earlier announced intention to seize the bag.

Because the seizure of Letsinger's bag did not occur until the officers actually took physical possession of the bag, and not when they merely announced their intention to do so, Letsinger's argument that they lacked reasonable suspicion at the point of seizure is of little moment.* Between the time when

* Letsinger claims that the officers lacked reasonable suspicion when they announced their intention to seize the bag. At that point, they knew he (1) had purchased a one-way ticket, (2) in cash, (3) from a source city (New York), (4) giving a bad call-back number, (5) claiming he was staying "on business" in North Carolina only a few days, and (6) he appeared very "nervous" and "fumbling" when the police confronted him. *Compare Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (*per curiam*) (holding that reasonable suspicion did not exist where defendant arrived in drug source city, in early morning, without luggage, and tried to conceal that he was traveling with his companion), *with United States v. Sokolow*, 490 U.S. 1, 3, 109 S.Ct. 1581, 1583, 104 L.Ed.2d 1 (1989) (holding that reasonable suspicion did exist where defendant purchased airline tickets in cash, was carrying $4000 in cash, gave the airline a false name and seemingly false telephone number, traveled from a known drug source city, Miami, stayed only 48 hours, appeared nervous, and checked no luggage). Because we hold that the officers had seized neither Letsinger nor his bag when they announced their intention to seize the latter, we need not consider whether they possessed reasonable suspicion at that time.

the officers announced that they were going to seize the bag and the time when they actually did seize it, Letsinger voluntarily (as the district court expressly found, J.A. at 140) announced that he was carrying marijuana in his bag. At that point, of course, the agents had probable cause (even greater than the reasonable suspicion that they needed) to seize the bag.

Accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting:

I must respectfully dissent. Lennie Letsinger's luggage was seized by officers who lacked "specific and articulable facts warranting a reasonable belief that [it] contain[ed] narcotics." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). I would therefore vacate his conviction and remand with instructions to suppress the evidence found in that luggage.

### I.

I have no broad quarrel with the majority's recitation of facts, but I do have a few supplements:

(1) At the suppression hearing, Detective Hanson testified that suspects are nervous when he interviews them "more often than not," and Letsinger's demeanor was "typical."

(2) When Letsinger asked why he had been singled out for investigation, Hanson replied cryptically that they had "reasons."

(3) Hanson testified that the hallway in which the officers stood was only twenty to twenty-five inches wide.

(4) The officers did not know the amount of cash Letsinger had paid for his ticket.

(5) The officers did not know the call-back number recorded by Amtrak, who recorded it, or whether it was recorded correctly.

With these additional facts to inform my analysis, I turn to the legal issues. Review is de novo. *Ornelas v. United States,* ——

U.S. ——, ——, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996).

### II.

A person or his personal property may not be forcibly detained, for even a moment, without a reasonable articulable suspicion. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *Place,* 462 U.S. at 706, 103 S.Ct. at 2644. However, so long as the person is free to break off an encounter with police and go about his business, there is no seizure, even though the encounter may last a good while. *See, e.g., United States v. McFarley,* 991 F.2d 1188 (4th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 342 (1993) (twenty-minute conversation while suspect and police walked along the street was not a seizure). Detention of a traveler's luggage is of course a seizure, and it implicates his Fourth Amendment rights to the same degree as a seizure of his person. *Id.* at 1192. Announcement of the officers' intent to detain luggage is the seizure, *id.,* because at that point the traveler's unrestricted liberty to call off the encounter and go unimpeded about his business ends. *Place,* 462 U.S. at 708, 103 S.Ct. at 2645 (seizure of luggage implicates not just traveler's possessory interest in his belongings; it infringes on personal liberty by disrupting his itinerary). Though the majority dismisses its language as mere dictum, the *Place* Court was emphatic on this point:

> There is *no doubt* that the agents made a "seizure" of Place's luggage when, following his refusal to consent to a search, the agent *told* Place that he was going to take the luggage to a federal judge to secure issuance of a warrant.

*Id.* at 707, 103 S.Ct. at 2645 (emphasis added). Even if this passage does not govern of its own force, we made it into circuit law in *McFarley,* 991 F.2d at 1192. The *McFarley* holding does bind us as a panel of this court, and it ought to be applied here.

The majority would distinguish *McFarley* because here a fact of "constitutional import" occurred between the announcement of the seizure and its physical execution—namely, Letsinger's statement that marijuana might

be in the bag. This argument assumes what it seeks to prove. If the voluntariness of the encounter was already broken—as *Place* and *McFarley* say it was—Letsinger's actions in the face of the claim of lawful authority cannot retroactively validate that claim. *Cf. Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968) (search "incident to" arrest could not serve as part of the arrest's justification); *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) ("consent" to search that followed illegal claim of authority was not voluntary); *United States v. Wilson*, 953 F.2d 116, 126 (4th Cir.1991) ("Of course, the police may not rely on events or observations subsequent to the commencement of the seizure to bolster the argument that they had reasonable suspicion.").

As further support for its distinction, the majority relies on *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a decision that it quite correctly notes is not mentioned in *McFarley*. I might add that *Hodari D.* is not mentioned in the briefs of the parties either, and for good reason: Letsinger did not flee or otherwise resist[1] these officers. *Hodari D.* is thus inapposite.

In my view, the majority not only applies *Hodari D.* outside its context, but also misinterprets the Court's idea of "submission" to authority. The seizure of a person or his property rarely makes him happy. He may scream, curse, beg, cajole, or connive, but if he does not run, hide, pull a gun, or place any physical obstacle in the officers' way, he has submitted. *See, e.g., Wilson*, 953 F.2d at 122–123. After all, as the majority emphasizes, the essence of a seizure is generally the taking of physical possession; likewise, the essence of submission is generally the absence of physical resistance.

Finally, I should point out that Letsinger had no avenue of escape. He was standing in the doorway of a tiny sleeping compartment on a moving train. Three officers stood in the narrow hallway in front of him. Though the cramped quarters and moving train do not effect a seizure *ipsis factis, Florida v. Bostick*, 501 U.S. 429, 435–436, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389 (1991), they are most definitely relevant circumstances. *Id.* at 437–439, 111 S.Ct. at 2387–89. Letsinger's luggage was seized before he made his self-incriminating statements.

### III.

Because I would hold that Letsinger's bag was seized, I must address whether the officers possessed specific and articulable facts that would warrant a reasonable belief that it would contain contraband.[2] I will address the various "facts" relied on by the government in turn.

#### i. *From the Source*

As we all now know, New York is a "source city" for drugs, though this "fact" says nothing about any particular New Yorker. It is also a "source city" for bagels and stockbrokers, and I doubt the officers came to Letsinger seeking lunch or investment advice. New York is by far the nation's largest city, so an American picked at random is more likely to be from there than anywhere else.[3] Likewise, urbanites are more likely to rely on mass transportation than their rural or suburban fellow citizens. Probably dozens of passengers on Letsinger's train were from New York, but the officers came to see him. Their suspicion must have truly rested on something else.

---

1. The vast majority of *Hodari D.* cases involve flight, though a few occur where a suspect, though immobile, is able to physically fend off capture. *E.g., Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir.1994) (subject trapped in surrounded house resisted with gunfire).

2. I accept for purposes of argument that the basic *Terry/Place* "reasonable suspicion" test applies here, but I think it not insignificant that the officers would seize an item they had never even seen from *inside* Letsinger's private compartment. This compartment may not be the equiva-

lent of a hotel room, in which an individual has a strong interest in privacy, *see Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893–94, 11 L.Ed.2d 856 (1964), but it is much nearer that than a public airport concourse or a seat on the bus.

3. According to the 1990 census, nearly three percent (7,322,564 of 248,709,873) of the nation's population lives in New York. It is over twice as large as its closest competitor, Los Angeles (3,485,557).

And small wonder. *Millions* of law-abiding and crime-fearing Americans are from New York City. Countless others travel there or through there[4] for pleasure or lawful business, and the experience neither corrupts their blood nor taints their souls. No specific, articulable basis warranting a reasonable belief that Letsinger's luggage contained contraband can be gleaned from his boarding the train in New York.

### ii. *Legal Tender*

Paying for a one-way ticket with cash is not nearly so "suspicious" (if suspicious at all) where the mode of transportation is a train (or bus) rather than an airplane.[5] First of all, train tickets are generally cheaper than airline tickets, and trains attract persons of lower economic means. "Poverty is no disgrace to a man, but it is confoundedly inconvenient."[6] One of these confounded inconveniences is a dependence on cash. In the same vein, the expense of air travel prompts passengers to plan trips carefully, so one would expect a higher proportion of plane tickets to be round-trip.

Here, the "suspiciousness" ascribed to Letsinger's use of the currency of the United States as a legal tender for a debt is greatly attenuated by the lack of *any* details of that use. The agents who seized his luggage had no idea how much cash Letsinger used—and we are not told on appeal—or of anything peculiar about that cash. Now compare this vacuum of information with *United States v.*

*Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In *Sokolow,* the officers who stopped the defendant knew that he had purchased round-trip airline tickets from Honolulu to Miami for $2,100, *all in $20 bills* (105 by my count), and had peeled these from a wad twice as large. *Id.* at 4, 109 S.Ct. at 1583–84. The Supreme Court concluded that some reasonable suspicion could be gleaned from Sokolow's actions. *Id.* at 8–9, 109 S.Ct. at 1585–86. In this case, we have simply the unadorned fact that Letsinger paid cash, and unless we are willing to embrace the elitist (not to mention misguided) proposition that every upstanding citizen pays for any ticket, however cheap, with a credit card, we cannot impute any hint of wrongdoing to it.[7]

### iii. *Fear and Trembling*

Letsinger was nervous, but Hanson admitted that persons he interviews get nervous "more often than not," and Letsinger's nervousness was "typical." Of course, the more "typical" the behavior, the less "suspicious" it is. I suspect that it is a rare citizen indeed whose pulse does not quicken when he is confronted with three police officers at his door.

### iv. *Don't Call Us*

Lastly, there is the "bad" call-back number that Letsinger may have given Amtrak.[8] This point is perhaps the most "suspicious," but of what is not so clear. Letsinger was not traveling under an alias or attempting to

---

4. Letsinger himself is an example. According to the uncontradicted affidavits of his mother and sister, he is an accountant and lives in suburban Long Island. He boarded the Amtrak train in Manhattan because that is where the terminal is. New York may be a "source" of drugs, but it is also a transportation hub for persons traveling from somewhere else to somewhere else.

5. This insightful point was made by Senior Judge Phillips in the panel opinion in *United States v. Torres,* 65 F.3d 1241, 1246 (4th Cir.1995). The panel opinion was later vacated when we granted rehearing en banc; ultimately, we affirmed the judgment of conviction by an equally divided court. *United States v. Torres,* 77 F.3d 91 (4th Cir.1996) (en banc). Though no one can rely on *Torres* for precedent, I nonetheless find the logic of the panel opinion persuasive in its own right.

6. Rev. Sydney Smith, *His Wit and Wisdom,* quoted in *The Penguin Dictionary of Quotations* 369 (J.M. & M.J. Cohen eds.1960).

7. Where I live, there are still lots of purehearted folks who have never had a checking account, let alone a credit card. I suppose they are suspicious of banks and the world of high finance, which are suspicions that a student of the last seven decades of American history could not deem entirely groundless.

8. I say "may have given" because the only witness who testified at the suppression hearing, Officer Hanson, did not know the call-back number, who recorded it, or whether it was recorded correctly. Amtrak's passenger list had transposed two letters of Letsinger's name (rendering it "Lestinger"), and a similar transposition error was certainly possible as to his telephone number.

conceal anything about himself. What advantage he would have derived from giving a "bad" number to Amtrak is unexplained.

### v. *E Pluribus* ...

The question remains, however, whether these factors—the "source city," cash, one-way ticket, nerves, and wrong number—can collectively bear the weight that each falls so short of bearing alone. In my view, they cannot.[9] At most, they support only an "inchoate and unparticularized suspicion or 'hunch,'" *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, and are woefully inadequate as objective indicators of criminal conduct to assure that innocent Americans can pursue happiness without the unreasonable interference of the police, which is, after all, their cherished right.

I dissent.

---

**9.** *See, e.g., Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), where similarly innocuous "facts" were deemed insufficient to establish reasonable suspicion.