2001 UT App 245

**STATE of Utah, Plaintiff and Appellant,**

v.

**Kevin R. GRONAU, Defendant and Appellee.**

**No. 20000278–CA.**

Court of Appeals of Utah.

Aug. 16, 2001.

Mark L. Shurtleff, Attorney General and Scott Keith Wilson, Assistant Attorney General, Salt Lake City, for Appellant.

H. Don Sharp, Ogden, for Appellee.

Before Judges JACKSON, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 The State appeals from an order granting defendant Kevin R. Gronau's Motion to Suppress twenty pounds of marijuana seized from his rental vehicle, and a subsequent order dismissing a charge of Possession of Marijuana with the Intent to Distribute within the Presence of a Person Under 18 Years of Age, a second degree felony, in violation of Utah Code Ann. § 58–37–8 (1998). We reverse.

## BACKGROUND

¶ 2 On December 16, 1998, Gronau and his seventeen year-old son, traveling in a rental car, were driving northbound on Interstate 15, south of Nephi, Utah, when Sergeant Paul Mangelson (Mangelson) of the Utah Highway Patrol stopped Gronau for speeding. During the stop, Mangelson ran two computer checks on Gronau to check his driving status and his criminal history. While waiting for the computer checks to be processed, Mangelson asked Gronau if he had ever been in trouble. Gronau told Mangelson "No, I have never been in trouble. I'm not a troublemaker."

¶ 3 At about the same time this conversation took place, the first computer check came back indicating that Gronau had a valid driver's license. The criminal history check, however, had yet to come back. At that time, Gronau indicated to Mangelson that he needed to use the restroom, and Mangelson issued Gronau a written warning for speeding and told Gronau that he was free to go. Mangelson then told Gronau that he would contact him if the second computer check showed that Gronau had a criminal history. Gronau then proceeded to drive off.

¶ 4 As Gronau pulled away, Mangelson followed him and observed Gronau exit the freeway and pull into a truck stop. Gronau and his son parked and entered the truck stop. At approximately the same time, Gronau's criminal history check came back showing a 1991 drug arrest. Shortly thereafter, Gronau and his son returned to their vehicle and proceeded to Mickelson's Café, a Nephi restaurant.

¶ 5 After Gronau parked in the restaurant parking lot and exited his vehicle, Mangelson pulled up and parked behind Gronau's vehicle at a ninety degree angle. Mangelson exited his vehicle and approached Gronau, told Gronau about the results of the criminal history check, and informed Gronau that he suspected him of transporting narcotics. Mangelson then asked to search Gronau's vehicle. Gronau replied "No, you are not going to search my car. Me and my boy is [sic] going in and have [sic] breakfast." After Gronau's refusal, Mangelson told Gronau that he was going to call a K–9 unit to come to the parking lot and have the handler "run his dog around the car." Gronau responded, "Do whatever you want. We're going in for breakfast." At that point, Gronau and his son went into the restaurant.

¶ 6 While Gronau and his son were in the restaurant, Mangelson did in fact call a K–9 unit and upon arrival, the handler walked the K–9 around Gronau's vehicle. The K–9 alerted the officers to the presence of narcotics in the vehicle. Sometime thereafter, Gronau and his son exited the restaurant, at which point Mangelson informed Gronau that he and his son were free to go, but that he was seizing the vehicle. Mangelson informed Gronau that he was going to get a search warrant for the vehicle, at which time Gronau and his son walked across the street to a nearby gas station. Mangelson followed Gronau and asked him for his keys, and Gronau told Mangelson, "I'll call my attorney . . . and see what he says." Eventually, Mangelson spoke with Gronau's attorney on the telephone, and the attorney told Mangelson, "No, we're not going to give you nothing." Gronau and his son then acquired a ride and left the gas station.

¶ 7 Mangelson had the car towed to the sheriff's station, obtained a search warrant, and discovered twenty pounds of marijuana in a black duffel bag in the trunk. Gronau was charged with Possession of Marijuana with the Intent to Distribute within the Presence of a Person Under 18 Years of Age. On February 24, 1999, Gronau's attorney filed a motion to suppress "any and all evidence secured as a result of a search and seizure conducted on the automobile being driven by [Gronau] on the 16th of December, 1998."

¶ 8 Following a suppression hearing on Gronau's motion, the trial court concluded that

> There is no dispute that the initial stop was legal. However, the Court finds that the purposes of the stop were completed when Officer Mangelson issued Mr. Gronau a warning for speeding and Gronau drove away. The second encounter and subsequent seizure of Gronau's vehicle was unconstitutional.
>
> . . . .
>
> [D]ue to the fact that Officer Mangelson did not have an articulable, reasonable suspicion of criminal activity, the vehicle was wrongfully seized and the subsequent search pursuant to the search warrant was unconstitutional.

Subsequently, on March 23, 2000, the trial court dismissed the charge against Gronau with prejudice. The State timely appealed.

## ISSUE AND STANDARD OF REVIEW

¶ 9 The State argues the trial court erred when it concluded that Mangelson's actions amounted to an illegal seizure of Gronau's vehicle. The determination of whether an encounter with law enforcement constitutes a seizure under the Fourth Amendment is a legal conclusion that we review for correctness. *See Salt Lake City v. Ray,* 2000 UT App 55,¶ 8, 998 P.2d 274.

## DISCUSSION

¶ 10 The State argues that Mangelson's actions, which included parking at a ninety degree angle behind Gronau's car, "did not meaningfully interfere with [Gronau's] possessory interest in [his] vehicle and

therefore did not constitute a seizure under the Fourth Amendment." "A seizure under the [F]ourth [A]mendment occurs when a reasonable person, in view of all the circumstances, would believe he or she is not free to leave." *State v. Jackson*, 805 P.2d 765, 767 (Utah Ct.App.1990). However, under the Fourth Amendment, property, as opposed to a seizure of a person, is seized when there is some meaningful interference with the individual's possessory interests in that property. *See State v. Northrup*, 756 P.2d 1288, 1293 (Utah Ct.App.1988).

¶ 11 Three cases illustrate the application of Fourth Amendment jurisprudence in support of our conclusion that Mangelson did not unlawfully seize Gronau or his vehicle.

### 1. *State v. Jackson*

¶ 12 In *Jackson*, we were asked to decide if a seizure had occurred after a police officer stopped his patrol car behind the defendant's parked vehicle, thus blocking it. *See Jackson*, 805 P.2d at 767. We concluded that no seizure occurred. *See id.* at 768.

¶ 13 In *Jackson*, the defendant's vehicle matched the description of a vehicle involved in a robbery. *See id.* at 766. A police officer saw defendant's vehicle traveling on the highway and followed the vehicle in order to run a license plate check. *See id.* Before the officer completed the check, the defendant had pulled his vehicle into a parking lot adjacent to a bar. *See id.* The defendant exited his vehicle and approached the officer's car, which was still moving. *See id.* The officer stopped his patrol car behind the defendant's vehicle, thereby blocking the defendant's vehicle. *See id.* After an exchange between the defendant and the officer, the defendant was arrested for possession of stolen property and driving on a suspended license. *See id.* A subsequent search of the defendant's person revealed drugs, resulting in two charges of possessing a controlled substance. *See id.*

¶ 14 Although the defendant argued that a seizure occurred when the officer parked behind his car, we disagreed. *See id.* at 768. We concluded that "although [the officer] had ultimately blocked [the] defendant's car, the blocking did not occur until after [the] defen-

dant had exited his car of his own volition." *Id.* at 767. Further, the "[d]efendant arrived at the parking lot to the [bar] not because [the officer] was following him, but rather because he freely chose to go there." *Id.* at 768. Ultimately, the "[d]efendant was free to walk to the bar or wherever he chose." *Id.* We concluded that "a reasonable person would have believed that he or she was free to leave, *notwithstanding the fact that his or her vehicle was blocked.*" *Id.* (emphasis added).

### 2. *United States v. Letsinger*

¶ 15 In *United States v. Letsinger*, 93 F.3d 140 (4th Cir.1996), the defendant was approached by three police officers while traveling on a train. *See id.* at 142. The officers identified themselves and asked if they could speak with the defendant, and the defendant agreed. *See id.* During the conversation, the officers asked the defendant if he had any luggage. *See id.* The defendant replied that he had one bag, at which point the officers asked the defendant if they could search the bag. *See id.* The defendant then asked the officers if he was required to let them search his bag. *See id.* One of the officers told the defendant "we can only ask for your cooperation." *Id.*

¶ 16 The defendant told the officers that the bag contained personal papers. *See id.* At that point, one of the officers told the defendant that "based on the information [the officers] had, they were going to detain his bag, [and that the defendant] could retrieve it later, and otherwise he was 'free to do whatever he wanted to do.'" *Id.* The officers, however, did not physically detain the bag at that time. *See id.* Rather, the officers continued to talk with the defendant about the bag, during which time the defendant told the officers that he had marijuana in the bag. *See id.*

¶ 17 Upon hearing that the bag contained marijuana, the officers physically seized and searched the defendant's bag, discovering nearly three thousand grams of crack cocaine. *See id.* The officers then arrested the defendant. *See id.* Prior to trial, the

defendant filed a motion to suppress, which the trial court denied. *See id.*

¶ 18 On appeal, the defendant argued that the officers seized his bag when they announced that they intended to detain it. *See id.* at 143. The court explained that "once a suspect yields to an officer's show of authority over an object within the suspect's custody or control ... it is arguable that the suspect's possessory interests have been 'meaningfully interfered' with to a sufficient degree to justify a conclusion that the object has been seized." *Id.* at 144.

¶ 19 That said, the court rejected the defendant's argument, concluding that "assum[ing] it is possible for a show of authority to effect a seizure of an object, [the United States Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)] requires that there be a submission to that show of authority." *Id.* at 145. "At the very least, ... we believe that the suspect must clearly acquiesce to the officer's show of authority over the object in the suspect's possession." *Id.* The court held that "assuming that a complied-with show of authority can constitute a 'seizure' of an object from one's immediate custody or control, [the defendant's] bag was seized only when the officers physically took possession of it." *Id.*

### 3. *United States v. Gant*

¶ 20 In *United States v. Gant*, 112 F.3d 239 (6th Cir.1997), the defendant, a bus passenger, argued that his bag was "seized" when a police officer moved the defendant's bag from the overhead compartment down to the seat for a K 9 narcotic sweep. *See id.* at 240.

¶ 21 In determining that the officer did not seize the defendant's bag, the court explained that "no meaningful interference with [the] defendant's possessory interest in his bag," *id.* at 242, occurred because (1) "[t]he bag was moved only a short distance ... for a short time;" *id.*, (2) "the movement occurred at a time when [the] defendant had left the bag unattended, so his access to it was never impaired;" *id.*, and (3) "had the [K–9] not indicated that the bag contained drugs, [the] defendant would have been able to travel uninterrupted to the next stop with his bag."

*Id.* The court concluded that "[b]ecause there was no meaningful interference with [the] defendant's possessory interest in his bag, there was no seizure." *Id.*

## ANALYSIS

¶ 22 We believe that *Jackson* is applicable and that the court's analysis logically extends to the facts of the present matter. Given the lack of Utah case law available to guide this court under this rather peculiar factual scenario, the conclusions reached by the Fourth and Sixth Circuits regarding the seizure of tangible personal property are persuasive, particularly in light of our discussion in *Jackson*.

¶ 23 In the present matter, Gronau, like the defendant in *Jackson* who drove to the bar, went to the restaurant not because Mangelson was following him, "but rather because he chose to go there." *Jackson*, 805 P.2d at 768. Further, Gronau had already exited his vehicle when Mangelson pulled up behind him, and after exiting the vehicle, Gronau was "free to walk to the [restaurant] or wherever he chose," *id.*, as was evident when he ended the conversation with Mangelson and went inside to have breakfast.

¶ 24 Next, Gronau did not acquiesce to Mangelson's "show of authority." *Letsinger*, 93 F.3d at 145. After Mangelson pulled up behind Gronau and exited his vehicle, he asked Gronau, "[D]o you mind if I check your car?" At this point, Mangelson had already informed Gronau that he thought Gronau was transporting narcotics. Gronau denied Mangelson's request saying "No, you are not going to search my car." Mangelson then told Gronau he was going to call a K–9 unit to "run his dog around the car." Gronau defiantly told Mangelson, "Do whatever you want. We're going in for breakfast."

¶ 25 As such, the arrival of the K–9 and its subsequent alert to narcotics in Gronau's vehicle occurred after Gronau "had left the [vehicle] unattended, so [Gronau's] access to it was never impaired." *Gant*, 112 F.3d at 242. Additionally, "had the [K–9] not indicated that the [vehicle] contained drugs, [Gronau] would have been able to travel uninterrupted to [his] next stop." *Id.*

¶ 26 Mangelson seized Gronau's vehicle only after Gronau exited the restaurant and returned to the vehicle. At that point, Mangelson asked for Gronau's keys, and thereby meaningfully interfered with Gronau's possessory interest in his vehicle. By this time, however, Mangelson already had reason to believe that the vehicle contained narcotics.

¶ 27 In sum, the factual similarities and the court's analysis in *Jackson* illustrate that no seizure occurred until after Mangelson had probable cause. Therefore, Mangelson did not "meaningful[ly] interfere[ ] with [Gronau's] possessory interest" in his vehicle until after Mangelson had probable cause. *Northrup*, 756 P.2d at 1288.

¶ 28 We therefore reverse the trial court's order granting Gronau's Motion to Suppress and remand the case back to the trial court for proceedings not inconsistent with our decision.

¶ 29 I CONCUR: NORMAN H. JACKSON, Associate Presiding Judge.

ORME, Judge (dissenting):

¶ 30 In this case, the question is not whether Gronau would have reasonably believed he was personally free to leave. It is conceded that he was personally free to leave, as demonstrated by his strolling off to breakfast. Rather, the question is whether he would have reasonably believed he was free to drive off in his vehicle. If he was not, the conclusion is inescapable that the vehicle had been seized by Sergeant Mangelson.

¶ 31 Even ignoring Sergeant Mangelson's unstated intention to hold the vehicle pending further investigation,[1] however, the totality of the circumstances clearly establishes that Gronau's vehicle was seized: (1) Officer Mangelson informed Gronau that he was going to "contact him" regarding the criminal records check, suggesting that the traffic stop had in a sense only been suspended, and not, in fact, ended; (2) Mangelson kept Gronau's vehicle under surveillance and followed it to the restaurant; (3) Mangelson pulled his patrol car up to Gronau's vehicle at a 90 degree angle; (4) Mangelson asked if he could search the vehicle, and Gronau would not consent, yet Mangelson did not then depart; (5) Mangelson informed Gronau that he was bringing in a narcotics dog to sniff the car, and Mangelson remained by the car until the dog and its handler arrived. As the trial court held, these circumstances, taken as a whole, would indicate to a reasonable person that he was not free to leave in his vehicle, but rather that his car was being detained pending the arrival of the narcotics dog, which, in fact, it was.

¶ 32 The Utah case primarily relied on by the majority is readily distinguishable. *State v. Jackson*, 805 P.2d 765 (Utah Ct.App.1990), *cert. denied*, 815 P.2d 241 (Utah 1991), held that the person of the defendant had not been seized; it did not address whether the defendant's *car* had been seized. *See id.* at 768. Moreover, unlike the defendant in *Jackson*, Gronau did not voluntarily initiate the contact with the officer. *See id.* at 768. His interaction with Sergeant Mangelson was in response to Mangelson's investigation and questions, continuing from the earlier traffic stop.

¶ 33 The federal cases primarily relied on by the majority, while not binding in any event, are also distinguishable. The majority cites *United States v. Letsinger*, 93 F.3d 140 (4th Cir.1996), *cert. denied*, 520 U.S. 1266, 117 S.Ct. 2437, 138 L.Ed.2d 197 (1997), for the proposition that for a seizure of an object to occur by a "show of authority," there must be a "submission to that show of authority." *Id.* at 145. The majority appears to suggest that Gronau never acquiesced to the officer's show of authority. However, the fact that Gronau did not attempt to drive away contradicts this suggestion.

¶ 34 The majority also cites *United States v. Gant*, 112 F.3d 239 (6th Cir.1997), in concluding that Sergeant Mangelson did not meaningfully interfere with Gronau's possessory interest in his vehicle until after he had probable cause. I disagree. Here, Sergeant Mangelson's indication after the initial stop that he intended to maintain contact with

---

1. Sergeant Mangelson admitted in his testimony that he had determined, long before the dog showed up, to detain the vehicle.

Gronau, his continued surveillance, his subsequent prolonged partial blocking of the vehicle, and his indication that a drug-sniffing dog was on its way, sent a clear signal to Gronau that he was not free to take the vehicle and leave.

¶ 35 I believe the trial court ruled correctly, and I would affirm its judgment.