974 F.Supp. 542 (1997)
James DESROCHES, II, a minor, by his father and next friend, James DESROCHES, Plaintiff,
v.
Michael CAPRIO, Roy D. Nichols, Jr., and City of Norfolk School Board, Defendants.
Civil Action No. 2:97cv460.
United States District Court, E.D. Virginia, Norfolk Division.
July 31, 1997.
*543 Mary Catherine Bauer, A.C.L.U. of Virginia, Richmond, VA, Frank Morris Feibelman, Richmond, VA, for Plaintiff.
Jacob Paul Stroman, IV, Office of the City Attorney, Norfolk, VA, Harold Phillip Juren, Deputy City Attorney, Norfolk, VA, for Defendant.

ORDER AND OPINION
DOUMAR, District Judge.
James DesRoches, II ("Jim") filed this lawsuit through his father, James DesRoches, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated in connection with a search of high school students' backpacks at Granby High School on May 2, 1997. For the reasons stated below, this Court concludes the May 2, 1997 search *544 that school officials proposed to conduct of Jim DesRoches required individualized suspicion. Because school officials lacked individualized suspicion as to Jim DesRoches, the search would have been unconstitutional if carried out. Thus, the refusal of Jim Des-Roches was justifiable under the Fourth Amendment to the United States Constitution. Accordingly, this Court enjoins the school board from punishing Jim DesRoches for his refusal to consent to the search. The Court, however, finds in favor of defendant Michael Caprio, the school principal, as the doctrine of qualified immunity shields him from any monetary damages. Admittedly, monetary damages could not be sought from the defendant school board, and damages were not sought from defendant Nichols. Therefore, monetary damages are denied.

I. Factual and Procedural Background
At the time of the events at issue in this suit, Jim DesRoches was a ninth-grade student at Granby High School. On May 2, 1997, he attended his fourth period, which was an art class. A lunch break interrupted this class, with approximately one-half of the class conducted before lunch and one-half conducted after lunch. During the first half of the class, a female student, Shamra Hursey, changed her shoes and placed a pair of sneakers on top of the table where she and other students had been sitting. When the bell rang for lunch, most students, including Shamra Hursey and Jim DesRoches, left for lunch.
During lunch, the art classroom was unlocked, and the teacher remained in the classroom. For a portion of the time, the teacher was in a closet in the classroom, cutting paper. The teacher could not see out of the closet into the classroom, but she stated that while she was in the classroom she never saw any students who she did not know during the lunch period. A student in the classroom during the lunch period, however, testified that at least one student who was not enrolled in the fourth period art class was in the classroom during lunch. A few other students who were enrolled in the class returned to the classroom for a few minutes during lunch. One of these students testified that she saw the shoes in the classroom during the lunch period. Another student testified that she saw Jim DesRoches in the school's cafeteria and its adjoining court-yard during the lunch break. She further stated that Jim had his backpack with him during lunch. Jim returned to the classroom after Shamra.
Upon her return from lunch, Shamra noticed that her shoes were missing. Other students, including Jim DesRoches, helped her search for the shoes in the classroom. When the shoes were not found, Shamra reported the theft to James Lee, a school official responsible for school security. Shamra told Lee that she changed her shoes prior to lunch, that she left them in the classroom, and that the shoes were missing upon her return. Lee then conferred with the teacher and the student who had seen the shoes during the lunch break. Lee did not ask about any particular student's whereabouts during lunch or at any other time. Lee was informed that another student had noticed the previous day that a ring she had left in the same art classroom was missing, raising concern that this was the second incident of theft within a short period of time. Lee's understanding was that there had been students in the art classroom at all times during lunch, that the teacher knew all these students, that none of the students had been left alone in the classroom, and that the teacher was in the classroom at all times.
Lee then decided to conduct a search of all the backpacks belonging to the students in the art class. Nineteen students were enrolled in the class.[1] Lee called in a security officer to perform the searches. Lee asked the students if anyone objected to having their backpacks searched. Jim DesRoches and another student raised their hands. When informed that a refusal to consent would be punished with a ten-day suspension[2], the other student withdrew his objection *545 to the search. Despite the suspension penalty, Jim DesRoches continued to object to the search.[3] He watched as all the other students' backpacks were searched. The search did not reveal the shoes. Jim was then escorted from the classroom to the discipline office.
DesRoches' parents were called. They were informed of the events, of their son's refusal to consent to the search, and his possible suspension. They supported their son's refusal to consent to the search, came to the school, and took Jim home to begin serving the term of suspension. At some point after the search was completed, the principal of Granby High School, Michael Caprio, was consulted and told of Lee's understanding of the situation. Caprio approved of Lee's actions and ratified Lee's decision to follow the rule requiring the suspension of Jim because of his refusal to consent to the proposed search.
Jim DesRoches filed this lawsuit on May 8, 1997, pursuant to 42 U.S.C. § 1983. He claimed violations of the right to be free from unreasonable searches and seizures under the Fourth Amendment, the right of free expression pursuant to the First Amendment, and the right to due process of the law. He asked for money damages and a temporary restraining order allowing his return to school. This Court heard argument on the motion for a temporary restraining order on May 12, 1997. Before a ruling was entered, the parties reached an temporary agreement that allowed Jim to return to school, pending a decision on the merits of the case. The case was expedited, and a non-jury trial was held on May 28, 1997. The facts of the case were largely undisputed, leaving pure legal issues to be decided.

II. Fourth Amendment Analysis
The central question in this case is whether school officials may search a large group of students for stolen property when school officials suspect that a student in the group is guilty of the larceny, but the officials lack individualized suspicion as to any particular student.
The Fourth Amendment to the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The Fourth Amendment protects citizens from arbitrarily conducted and overly broad searches by government officials. In a paradigmatic criminal law search, law enforcement officers will have concrete information that would lead a reasonable person to conclude that a crime had been committed  or in other words, the officers would have "probable cause" to believe a crime was committed. Law enforcement officers also would possess information pointing them to a particular suspect  termed individualized suspicion. Armed with this information, law enforcement officers usually can obtain a warrant to search an individual's property or person. As a general rule, then, searches are usually reasonable and thus constitutional when supported by a warrant based upon probable cause and individualized suspicion.
Despite these general propositions, the Supreme Court has noted that the Fourth Amendment is flexible and that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989). In this case, the Court must decide whether the circumstances justify a departure from the baseline rule that individualized suspicion is required for a search to be reasonable.

A. The T.L.O. Case
The leading case on searches in schools is New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720, (1985). T.L.O. involved a search of two students who had been caught by a teacher smoking in the school *546 bathroom. When one student denied smoking, the principal searched her purse. When the principal opened her purse, he saw the cigarettes and rolling paper. This discovery led him to conduct a more exhaustive search of her purse, which revealed marijuana, cash, and drug paraphernalia. The Court addressed both whether the initial opening of the purse was justified and whether the broader search of her purse was justified.[4]
In its opinion, the Supreme Court established several basic principles applicable to school searches. First, the Court established the broad proposition that the Fourth Amendment applies to minor students attending public school. Id. at 333, 105 S.Ct. at 738. Second, it found that students have a reasonable expectation of privacy in their possessions at school, including their back-packs, entitling the student's possessions to Fourth Amendment protection. Id. at 337-38, 105 S.Ct. at 740-41 (noting "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.") Third, the Court decided that school officials do not act in loco parentis during the normal school day[5], and that school officials must act in conformity with the Fourth Amendment. Id. at 366-67, 105 S.Ct. at 740.
Using a balancing approach first set forth in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) to examine the search conducted in T.L.O., the Court noted that the "privacy interests of school-children" must be weighed against the "substantial need of teachers and administrators for freedom to maintain order in the school." T.L.O., 469 U.S. at 341, 105 S.Ct. at 742. These competing interests led the Court to conclude that some deviation from standard Fourth Amendment requirements was appropriate in the unique school context. The Court held that school officials could permissibly search students without warrants if the search was based upon "reasonable suspicion," a quanta of suspicion less than probable cause. The Court held that "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be `justified at its inception' where there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." Id. at 341-42, 105 S.Ct. at 743. A search's ultimate reasonableness should be judged according to the totality of the circumstances. Id. at 341, 105 S.Ct. at 742-43.
Viewing the totality of the circumstances in the T.L.O. case, the Court concluded that the initial opening of the purse was constitutionally permissible because it was based upon reasonable suspicion, and that the ensuing broader search of her purse was also reasonable. Thus, the search was justified at its inception and reasonable in its scope. Because the search in T.L.O. occurred after a teacher claimed to have seen both students smoking, school officials had individualized suspicion that both students had violated school rules. Id. at 342 n. 8, 105 S.Ct. at 743 n. 8. Accordingly, the Supreme Court expressly declined to address the precise question at issue in this case  whether individualized suspicion is a prerequisite to constitutional school searches. In a footnote in the opinion, the Court explained:
We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities. In other contexts, however, we have held that although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] ... The Fourth Amendment imposes no irreducible requirement of such suspicion." Exceptions to the requirement of individualized suspicion are generally appropriate only where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not `subject to the discretion of the official in the field.'" *547 Id. at 342 n. 8, 105 S.Ct. at 743 n. 8 (citations omitted).

B. The Individualized Suspicion Requirement
This Court must now address squarely the issue that the Supreme Court declined to decide in T.L.O., namely whether individualized suspicion should be required in a school search designed to reveal stolen property. As the T.L.O. Court noted, the constitutional baseline rule remains that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." United States v. Martinez-Fuerte, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).
Searches conducted without individualized suspicion have been upheld, however, in "certain limited circumstances." Chandler v. Miller, ___ U.S. ___, ___, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997) The Supreme Court has termed these circumstances "special needs." If a situation presents such special needs, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Id. A search conducted without individualized suspicion may be reasonable "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion,...." Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 624, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989).
Thus far, the Court has approved dispensing with the individualized suspicion requirement in only a few, highly publicized cases, all of which implicated important government interests such as ensuring the safety of the public. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding random drug testing of student athletes); Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding random sobriety checkpoints designed to locate impaired drivers); Skinner, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (upholding post-accident drug testing of railroad employees); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding suspicionless drug testing of Customs Officials who work the front line of drug interdiction efforts); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding vehicle stops at fixed checkpoints to search for illegal aliens); Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (upholding searches of residences by housing code inspectors even though inspectors lacked specific knowledge about any particular violations).
These departures from the individualized suspicion requirement have been approved only when the governmental need to search was great, when the intrusion was limited, and when a more rigorous suspicion standard would have been unworkable. The Supreme Court has indicated consistently that the government's need to search must "be substantial  important enough to override individuals' acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Chandler, ___ U.S. at ___, 117 S.Ct. at 1303. In the cases upholding searches in the absence of individualized suspicion, the Court has always noted painstakingly the substantiality of the problem sought to be combated by the searches. See, e.g., Von Raab, 489 U.S. at 670, 109 S.Ct. at 1393 (noting the government's "compelling interest" in keeping Customs Officials drug-free); Skinner, 489 U.S. at 634, 109 S.Ct. at 1422 (noting that "surpassing safety interests" justified drug testing railroad employees); Sitz, 496 U.S. at 451, 110 S.Ct. at 2485 (observing that "reports of alcohol-related death and mutilation on the Nation's roads are legion.").
The Court also has carefully observed that imposing an individualized suspicion requirement in these "special needs" cases would be impractical or unworkable. Von Raab, 489 U.S. at 674, 109 S.Ct. at 1395 (noting the difficulty of detecting drug impairment and that it was not "feasible" to monitor Customs Employees closely); Skinner, 489 U.S. at 631, 109 S.Ct. at 1421 (reasoning that imposing *548 an individualized suspicion requirement in the aftermath of a train accident would impede investigative efforts and would result in the loss or deterioration of the evidence); Martinez-Fuerte, 428 U.S. at 557, 96 S.Ct. at 3082-83 (noting that "[a] requirement that stops on major routes inland always be based on reasonable suspicion would be impractical ..."); Camara, 387 U.S. at 537, 87 S.Ct. at 1735 (observing "it is doubtful that any other canvassing technique would have acceptable results").
When the governmental interest has not been as strong or when other viable methods of addressing the problem existed, courts have insisted upon individualized suspicion, and suspicionless searches have not passed constitutional muster. In fact, the Supreme Court most recently struck down a Georgia law requiring that candidates for political office undergo drug testing, reasoning that the governmental interest in testing candidates not suspected of any wrongdoing was not strong enough the suppress the "Fourth Amendment's normal requirement of individualized suspicion." See Chandler v. Miller, ___ U.S. ___, ___, 117 S.Ct. 1295, 1303, 137 L.Ed.2d 513 (1997).

C. Individualized Suspicion in School Search Cases
More specifically, a handful of cases after T.L.O. have considered the individualized suspicion requirement in the school context. Most notable is the Supreme Court's pronouncement in Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), a case which challenged the constitutionality of mandatory drug testing of student athletes. The Court upheld the student testing, declining to require individualized suspicion before student drug testing. Once again employing a balancing approach, the Court noted that the nature of the infraction being investigated was relevant because a school's need to search must be balanced against the intrusiveness of the search. As in the other "special needs" cases, the Court took pains to stress that the testing of student athletes was a special context. The Court noted that the drug problem at the school and among the athletes was rampant, and that student athletes would be particularly endangered if they used drugs. The Court concluded that the severity of the problem was more weighty than the minor intrusion of drug testing. Lower courts also have been willing to allow broad searches for drugs within schools. See, e.g., Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316 (7th Cir.1993) (upholding strip search of student suspected of carrying drugs in his crotch).
Similarly, searches for weapons within schools have been readily upheld even in the absence of individualized suspicion, such as metal detector searches of all students. See, e.g., Thompson v. Carthage Sch. Dist., 87 F.3d 979 (8th Cir.1996) (approving of principal directing male students to take off their shoes and socks and empty their pockets because reports of reports of a knife and gun at school); People v. Dukes, 151 Misc.2d 295, 580 N.Y.S.2d 850 (N.Y.Crim.Ct.1992) (metal detector searches); In the Interest of F.B., 442 Pa.Super. 216, 658 A.2d 1378 (1995) (metal detector searches); In re Alexander B., 220 Cal.App.3d 1572, 270 Cal.Rptr. 342 (2d Dist.1990) (upholding search of five or six students when one student in the group reportedly had a gun).
The bulk of reported cases on school searches have considered searches for drugs or weapons and have fairly uniformly upheld these searches because of the need to protect the safety and welfare of students. Thus, in almost all these special need cases, the need to protect other students from drugs or weapons overrode the individual students' rights of privacy. Fewer cases have considered school searches not designed to protect students' safety. Closer to the circumstances of this case than the cases previously cited is Burnham v. West, 681 F.Supp. 1160 (E.D.Va.1987). In Burnham, large groups of students were searched at different times for magic markers, marijuana, and portable radios. Possession of these items violated school rules. At the time of the searches, school officials suspected that at least some students had violated the rules, but no individualized suspicion as to a particular student or even a smaller group of students existed. The court first noted the longstanding policy *549 against general searches, and concluded that the searches conducted had violated the Fourth Amendment because individualized suspicion was wholly lacking. The court was swayed by the "striking paucity of investigative measures reasonably calculated to narrow the field of suspects" and because the school had failed to establish that "exigency requir[ed] an immediate search without particularized suspicion." Id. at 1166. The court observed that it would strike the balance differently if the searches were conducted to reveal weapons or to combat a demonstrated serious drug problem, id. at 1167 n. 8, reasoning that, "reduction of the individualized suspicion requirement in such cases is only possible because other variables in the reasonableness equation have been correspondingly magnified." Id. at 1165.

D. Application
The search conducted in this case must be measured against the yardsticks of prior case law. As the cases discussed above make clear, Fourth Amendment analysis is practical. If the government's need or justification for searching is great, searches may be more intrusive and broader in scope. An individual's privacy rights may sometimes be sacrificed so that the government can ensure the safety and welfare of its citizens. Conversely, when the governmental interest is less compelling, the Fourth Amendment offers greater protection to individuals' privacy.
In this case, school officials wanted to search students' backpacks to determine if one of the students had stolen a pair of sneakers from another student. Ascertaining who stole the shoes clearly is not as important a governmental interest as searching for drugs or for weapons. In the former situation, the crime has already been committed. In the latter situation, a crime has either not yet been committed or the crime's effects could continue. For example, another student could be harmed by the use of a weapon or the dispensing of a drug. Unlike these situations, this case does not present an extraordinary situation in which the school's interest was sufficiently substantial or compelling; a stolen pair of tennis shoes simply does not present exigent circumstances or a future danger to other students. If the school had delayed the search to gather individualized suspicion, there was no risk that the evidence would have deteriorated (as might occur in a drug case) and only the slightest risk that the evidence would be lost, for the school could have detained the students during the investigation. Nothing prevented the school from gathering further information to ferret out suspects. Interviews could have been conducted to determine if DesRoches had the time and opportunity to take the shoes. Given the Supreme Court's admonitions that individualized suspicion should be required in all but the most compelling cases, this Court simply can not dispense with the requirement of individualized suspicion in this case.
Of course, this Court could hold that individualized suspicion is never required in the school setting. Such a ruling, however, would sweep too broadly. In recognition of schools' needs and of students' diminished expectations of privacy, schools are allowed to search students upon a lesser showing of reasonable suspicion, and schools need not establish probable cause or obtain warrants. Thus, a student's Fourth Amendment rights are already significantly abrogated. If this Court also were to eliminate the individualized suspicion requirement entirely, the Fourth Amendment practically would be a dead letter to students. Because it is well established that "students [do not] shed their rights ... at the schoolhouse gate," Tinker v. Des Moines Ind. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), this Court concludes that the appropriate balance is struck by retaining the individualized suspicion requirement as a baseline rule from which schools may deviate only in special circumstances within schools. This case does not present such circumstances.
In some situations, the number of suspects may be so small that the entire group of students may be searched without violating the requirement of individualized suspicion because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment...." T.L.O., 469 U.S. *550 at 346, 105 S.Ct. at 745 (citing Hill v. California, 401 U.S. 797, 804, 91 S.Ct. 1106, 1110-11, 28 L.Ed.2d 484 (1971)). A school is not required to muster evidence that a student to be searched is the only potential suspect before a search may be conducted. For example, if two students were in a sealed room when a theft occurred, it is reasonable to search both these students because enough suspicion as to each student exists to support a search based upon reasonable suspicion. At the other extreme, if one hundred students were in the sealed room, a search of all of them for a single stolen item surely would be unreasonable. A search of a large class could be appropriate in cases where weapons or drugs are sought; for as the government's interest in searching increases, a search of a correspondingly increasing class of people may be conducted.
This case involved a search of about nineteen students for a pair of stolen shoes. But, the students in the art class were not the only individuals who could have taken the shoes. Students other than those enrolled in the class or even school staff could have stolen the shoes, meaning the group of potential suspects was not limited to those students enrolled in the art class, even though Lee and the teacher initially believed that all possible suspects were in the class. A search of all nineteen students in the class, especially when it is not certain that one of them is guilty, casts too wide a net when the evil combated is petty larceny of an object that could not harm others.[6]
Because the entire class could not be reasonably searched, this Court concludes that sufficient individualized suspicion was required to support the search of Jim DesRoches. As to Jim, no sufficient individualized suspicion existed. In fact, further questioning likely would have revealed that Jim lacked the opportunity to steal the shoes, probably dissipating any amount of suspicion as to him individually. Thus, Jim DesRoches' Fourth Amendment right to be free from unreasonable searches would have been violated if school officials had conducted the proposed search.[7]
This Court regrets that it cannot lay down a precise rule giving schools guidance about how many students may be searched in particular circumstances without running afoul of the Fourth Amendment. Such an opinion would be impermissibly advisory and inherently arbitrary, for the touchstone of Fourth Amendment analysis is "reasonableness," a standard which defies precise explication because it is wholly dependent upon the particular, unique facts of each case. See Camara, 387 U.S. at 536-37, 87 S.Ct. at 1735 (noting that "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails").
Despite its inability to provide a precise rule for schools to follow in every situation, this Court can offer some guidance, which may aid schools in implementing searches when drugs and weapons are not the subject of the search. A search's reasonableness must be judged at its inception. Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). When searching for tennis shoes and similar objects, *551 school officials must have some individualized suspicion as to each student the school want to search. Nothing prevents the school from asking students to voluntarily consent to a search. In this case, the vast majority of the students had no objection to the search; only two students indicated any reluctance to be searched.[8] Once students have voluntarily consented, the school should refrain from searching any students while it determines if has enough reasonable suspicion to search the individual non-consenting students. At this point, the school official could ask questions about where each student was, if anyone observed the student, or other questions designed to elicit information about whether individualized suspicion as to the non-consenting student exists. The school could also observe the student's response to questioning. Then, if the school has individualized suspicion as to a non-consenting student, that student should be searched along with and at the same time as other students who have consented. If the school lacks any particularized suspicion as to a non-consenting student, that student may not be searched and cannot be suspended for his refusal to give consent to what would be an unconstitutional search if conducted.
In this case, the consenting students were first searched, and the shoes were not found. Then Jim, the lone non-consenting student, was addressed. At this point, a school official could have reasoned that chances of Jim having stolen the shoes were greater given that the shoes were not discovered during the search of all the other students. But allowing Jim to be searched after the fruitless search of the consenting students compromises the principle that a search's reasonableness must be judged at its inception. A bifurcated search (first of the consenters, then of the non-consenters) guarantees that the search of non-consenting students would be judged not at the inception of the search of all the students, but would be judged after the inception of the search of all the other students. One's constitutional rights can not wax and wane according to whether others stand upon their constitutional rights. If all students had refused to give consent to be searched, Jim could not have been singled out for a search because no individualized suspicion existed as to him at the inception of the search of the class.
Unfortunately, schools and education necessarily suffer in the clash between education and "rights." This Court hesitates to hamstring even further schools' attempts to restore order and discipline to the classroom. Schools now have been steered far away from their educational mission and are forced to spend much time and energy disciplining unruly students, searching for weapons and drugs, and addressing myriad social problems. This Court wants to assist schools in furthering their primary role of education and in creating a orderly, safe haven where students feel that they and their belongings are safe. But this Court has a duty to follow the law and to balance between the needs of the schools with the right of individuals to be secure from unreasonable searches and seizures. Our Constitution is a compromise of competing values, and the results of protecting it in any specific case tastes sweet to some and bitter to others. But as the Burnham Court explained,
It might be expedient to allow a general search of students in a public school setting at the whim of the principal. Such a result might indeed enhance the principal's stated goal of increased order in the school. However, neither the Constitution nor its primary guardian  the federal judiciary  should bow to expediency. The constitutional rights of all citizens should be affirmed and protected in spite of any systemic discomfort created by mandating respect for those rights.
Burnham, 681 F.Supp. at 1167-68.
In summary, this Court concludes that Jim DesRoches' constitutional right to be free from an unreasonable search was violated. Granby High School is hereby ordered to eliminate all references to James DesRoches' *552 suspension by expunging his transcript and to reinstate him as if he had never been suspended.

III. Qualified Immunity of the Defendants
The plaintiff sued for money damages. At the trial on this matter, plaintiff conceded that monetary damages should not be entered against the City of Norfolk School Board or the superintendent of the school, Roy Nichols. The plaintiff thus seeks monetary recovery against the principal of the school, Michael Caprio, only. Caprio acted within the scope of his authority under state law in approving the suspension of DesRoches. See In re Allen, 106 F.3d 582, 593 (4th Cir.1997). Caprio is immune from monetary damages under 42 U.S.C. § 1983 if his conduct did not violate clearly established rights of which a reasonable official would have known at the time of the conduct. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
In this case, the Court cannot say the argument upon which plaintiff relies was so clear that a school official would have known he was violating clearly established law. The Supreme Court expressly declined to address the legal issue presented by this case and no Fourth Circuit precedent provided a clear answer. Rather, numerous other cases related to the Fourth Amendment but not specifically addressing the school context were integral to this Court's decision. Surely a school principal cannot be charged with full and comprehensive knowledge of subtle aspects of constitutional law.
In fact, this Court sympathizes with the situation in which Caprio and many other school officials find themselves. In this case, Granby High School officials were confronted with a decision that they needed to make quickly. The initial information indicated that chances were good that one of the students in the class had taken the shoes, and the school officials reacted to the information. If the law so allowed, this Court would applaud the decision. The Court notes that if a private school official had acted exactly as these public school officials did, there would be no case before this Court. Indeed, the very decision that the Court makes in this case today may encourage parents to enroll their children in such private schools. Be that as it may, the primary focus of school officials should remain on education, not law. Given this, a reasonable school official in the place of the defendant would not have known that the proposed search in question violated clearly established rights. Courts have so found in cases far more egregious than the instant case. See Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821 (11th Cir.1997) (upholding qualified immunity when school officials strip-searched two eight-year old girls accused of stealing money). Accordingly, Defendant Caprio is immune from monetary damages.

IV. Due Process and First Amendment Claims
Jim DesRoches' complaint also asserts that his due process rights were violated in connection with the search. That issue was not briefed or argued, however. This Court concludes that his right to due process was not violated. Jim was entitled to be told why he was being suspended; he was. He was entitled to hearing, which could be held post-deprivation. He received the hearing. Consequently, his due process rights were not violated, and his due process claim is denied. See Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).
Similarly, DesRoches' complaint also alleges that his First Amendment rights have been violated. Presumably, he argues that he was suspended because he voiced his objection to being searched. DesRoches was punished not for his statements but for his refusal to act. Therefore, the First Amendment offers Jim no additional protection, and this claim is also denied.
IT IS SO ORDERED.
NOTES
[1] The record does not indicate an exact number of students who were searched. Jim DesRoches approximated that seventeen or eighteen other students were present that day.
[2] Norfolk School Board Policy requires that a student who has missed more than ten days a semester fail that semester, unless good cause for the absences is established.
[3] Prior to this time, DesRoches was involved in other litigation also challenging the school's search policies as related to metal detector searches. He had discussed the propriety of particular searches with his attorney, Ms. Bauer, and with his parents. These discussions led him to conclude that the proposed May 2, 1997 search was inappropriate.
[4] Unlike the student in T.L.O., DesRoches' challenge is limited only to the school's grounds for conducting the search.
[5] School officials can act in loco parentis in situations outside the normal school day, such as field trips. See, e.g., Webb v. McCullough, 828 F.2d 1151 (6th Cir.1987).
[6] By drawing the distinction between acts endangering other students and petty larceny, the Court does not intend to downplay the significance of larceny within schools. Although larceny often is not perceived of as a problem of the same magnitude as drugs or weapons, its systemic effects are equally pernicious. For example, Granby High School changed its policies as a result of the theft in this case. Now the doors to classrooms are locked at lunch, and students may not enter. Students and teachers suffer from the resultant lack of freedom, and the atmosphere of the school deteriorates into one of mistrust. These are real and deleterious effects. Larceny, however, presents no exigencies requiring swift and immediate attention, and it does not endanger the safety of the students.
[7] Interestingly, a substantially similar ruling was made in another case almost exactly twenty years ago. That case, Bellnier v. Lund, 438 F.Supp. 47 (N.D.N.Y.1977), predated T.L.O. and considered a search of a class of students for three dollars. The Bellnier court predicted the Supreme Court's ruling that probable cause would not be required to search students and ruled that, given the minor nature of the infraction, the search conducted was unreasonable because school officials lacked any individualized suspicion as to a particular student in the class. Despite the significant development of Fourth Amendment jurisprudence since the 1970's, the Bellnier court's ruling is still persuasive to this Court.
[8] Of course, students' knowledge about the ten-day suspension policy may have been a significant factor in their willingness to be searched. The school's general policy of suspending non-consenting students was not challenged in this case. Jim DesRoches challenged only the policy's application to him.