OPINION OF THE COURT
Bruce Allen, J.
In recent years we have witnessed an increased use of magnetometers and scanning devices at our public buildings. This case involves the legal propriety of a metal detector search conducted at a New York City high school pursuant to *296 guidelines established by the Board of Education in 1989. To my knowledge, this is the first time this issue has been litigated. As will be shown, I find no legal barrier to the search.
The facts adduced at the suppression hearing on September 23, 1991, and supplemented by various submissions, are as follows. During the early morning hours of May 17, 1991, a team of special police officers from the Central Task Force for School Safety set up several metal detector scanning posts in the main lobby of Washington Irving High School. Signs announcing a search for weapons were posted outside the building.
Washington Irving, which is in Manhattan, was one of several schools selected for periodic scanning. The students at these schools had been told at the beginning of the year that searches would take place but they were not given any specific dates in advance. The entire procedure was governed by written guidelines adopted a few years earlier by former Chancellor Richard E. Green. The stated purpose of the search is to prevent students from bringing weapons into the schools.
With regard to general procedures, the guidelines require that the officers use hand-held scanning devices rather than magnetometers. All students entering the school are subject to the search although the officers may choose to limit the search by any random formula. For example, if the lines become too long, the officers may decide to search every second or third student. The officers are prohibited, however, from selecting a particular student to search unless there is a reasonable suspicion to believe that the student is in possession of a weapon.
As to each individual search, the guidelines provide that the officer who conducts the search is to approach the student and explain the scanning process. Then the officer asks the student to place any bags and parcels on a table and remove all metal objects from pockets. If a student refuses to cooperate, the officer notifies the principal or administrator who is stationed nearby to monitor the search. If the student cooperates, then the scanning takes place, beginning at the toes and continuing up to the head without actually touching the body. The bags and parcels are scanned, too. Students are searched by officers of the same sex.
The guidelines provide further that when a student’s bag or parcel activates the scanning device, the officer is to request *297 the student to open the container in question so that the officer can look for weapons. If a student’s body activates the device, the officer first repeats the request to remove metal objects. A second scan is then conducted and if the device is activated again, the officer escorts the student to a private area where a more thorough search is conducted.
Prior to the private search, the officer must ask the student for the third time to remove any metal objects. Then the search begins near the place where the device was activated. This is a pat-down search, geared to locate the item which triggered the scanning device. If the officer feels an object during the pat-down, the student is given a chance to remove it before the officer does. If such an object, once removed, appears to be the one which activated the device, the search ceases. The search can be continued only if a subsequent scan activates the device.
Against this backdrop, the defendant Tawana Dukes, a student, entered the front lobby of Washington Irving at approximately 7:15 a.m. on the morning of May 17 and took her place in line. When Ms. Dukes’ turn came, Special Police Officer Jessica Wallace, the sole witness at the hearing, introduced herself and asked Ms. Dukes to place her bag on the table. After Ms. Dukes did so, Officer Wallace scanned the bag with a hand-held metal detector. The device signalled the presence of metal inside the bag.
Officer Wallace next asked Ms. Dukes to open the bag. When the defendant complied with this request, the officer reached into the bag and removed a manilla folder. Once again, Ms. Dukes agreed to open this folder at the request of the officer. Upon looking inside the folder, the officer saw a black switchblade knife which had a blade of 4 to 5 inches. While they were looking at the knife Ms. Dukes stated, ”1 had it for my protection.”
Ms. Dukes was arrested and charged with criminal possession of a weapon in the fourth degree, a class A misdemeanor. She now moves to suppress the knife, claiming that her Fourth Amendment rights were violated.
Every legal discussion of the Fourth Amendment begins with the broad statement that unreasonable searches are prohibited. There are, of course, many different kinds of searches; as a result, the standard of reasonableness is somewhat flexible and may appear to vary from category to category. Reasonableness is typically associated with probable *298 cause but there are certain searches which are not based on probable cause.
The type of search which took place here is usually called an administrative search and it is never linked with probable cause or the issuance of a warrant. Designed to prevent the occurrence of a dangerous event, an administrative search is aimed at a group or class of people rather than a particular person. The theory is that any member of the group or class may be the agent who could cause the dangerous event to take place. Two common examples of administrative searches are the use of a magnetometer or scanning device at a public building and the highway checkpoint for drunk drivers.
An administrative search is upheld as reasonable when the intrusion involved in the search is no greater than necessary to satisfy the governmental interest underlying the need for the search. In other words, in determining whether the search is reasonable, the courts balance the degree of the intrusion, including the discretion given to the person conducting the search, against the severity of the danger posed. (See, People v Kuhn, 33 NY2d 203, 209 [1973]; see also, People v Scott, 63 NY2d 518, 525 [1984]; cf., Michigan State Police Dept. v Sitz, 496, US 444, 449-452 [1990].)
Airports typically use screening devices such as magnetometers to search all passengers just before they board an airplane. In Kuhn (supra) the Court of Appeals, faced with a passenger’s claim that a magnetometer search had violated his rights, applied the balancing test and held that the search was a reasonable one. After citing the "overwhelming” governmental interest in deterring air privacy and aircraft hijackings, the court went on to note that a magnetometer search, by definition, was minimally intrusive. (33 NY2d, supra, at 210.) Virtually every other court which has considered the propriety of magnetometer searches at airports has reached the same result. (See, e.g., United States v Davis, 482 F2d 893 [9th Cir 1973]; cf., People v Waring, 174 AD2d 16.)
A second public building where administrative searches have become increasingly popular is the courthouse. Not surprisingly, the courts have concluded that preentry searches for weapons of all visitors to these highly sensitive places do not violate the Fourth Amendment. Like the line of cases permitting airport searches, the courts have emphasized the minimal nature of the intrusion combined with the obvious governmental interest in preventing threats and acts of vio *299 lence. (See, e.g., Downing v Kunzig, 454 F2d 1230 [6th Cir 1972]; cf., People v Alba, 81 AD2d 345, 357 [1st Dept 1981], appeal dismissed 56 NY2d 642 [1982].)
How does the metal detector search conducted at New York high schools fare in this balancing test? Both the guidelines and the instant search demonstrate that this search, like most metal detector searches, is a minimally intrusive one. Thus, the officers are required to terminate the search at various junctures upon finding the metal which activated the scanning device. The officers are not permitted to begin the pat-down search until the scanning device has been activated twice. Even then, the officers must start the pat-down search in the precise area where the scanning device was activated. All told, the officers must follow a very detailed script as they search for weapons and nothing else.
The search of Ms. Dukes’ bag complied fully with the guidelines. After Officer Wallace identified herself, she asked Ms. Dukes to place her bag on a tray. The officer then held the scanning device near the bag. When the device was activated, the officer asked Ms. Dukes to open the bag. She immediately opened it and, moments later, the switchblade knife was recovered.
To be sure, the search which took place here differed from a metal detector search at an airport in one significant respect. An airport passenger who triggers a magnetometer remains free to walk away and not board the plane rather than be subjected to a more intrusive search. (See, People v Kuhn, 33 NY2d, supra, at 210.) Any greater intrusion proceeds only on the consent of the passenger.
Here, on the other hand, once a student activates the scanning device, the officer is duty bound to direct the removal of any remaining metal objects and, if necessary, to conduct a second scan. If the student activates the device a second time, a pat-down search necessarily ensues. And when, as in the case of Ms. Dukes, a student’s bag or parcel activates the device, the officer must ask the student to open the bag. Given these mandatory follow-up procedures, coupled with the absence of any reference to consent in the guidelines, it may be inferred that the student enjoys no right to terminate the search at any stage in the process.
The issue of consent is less crucial, however, in evaluating the over-all intrusiveness of the school search. After all, children are required by law to attend school. To allow stu *300 dents to walk away upon activating a scanning device would only encourage truancy: students not wishing to go to school that day could simply place metal objects in their pockets. Even assuming that a consent element could be added to the guidelines, it would be all but impossible to administer. How do you explain such a complex legal term to a naive 15 year old? Given the unique nature of the school setting, therefore, I am satisfied that the guidelines are minimally intrusive despite the absence of a consent provision.
In any event, consent is hardly a necessary component of a valid administrative search. In Downing v Kunzig (supra), the Sixth Circuit upheld a regulation requiring all persons entering a Federal courthouse to submit to a search of their briefcases and packages for weapons and explosives. The court did not even discuss the issue of consent in finding that the balancing test had been met. An attorney, much like a student, has little choice in the matter when an appearance in court is required.
Turning to the governmental interest involved here, it is beyond peradventure that safety in our schools, and concomitantly, preservation of an atmosphere conducive to education, are of vital importance. Weapons in schools, like terrorist bombings at airports and courthouses, are dangers which demand an appropriate response. According to school records, over 2,000 weapons were recovered in the 1990-1991 school year alone. There was a fatal shooting in a Brooklyn high school just a few months ago. If schools cannot operate in a violence-free atmosphere, then education will suffer, a result which ultimately threatens the well-being of everyone.
In sum, I find that the metal detector search in this case satisfies the balancing test and is reasonable. The switchblade knife recovered from Ms. Dukes’ bag during the search is thus admissible at trial. While the tension between personal rights and urgent social policies often presents hard choices for the courts (People v Scott D., 34 NY2d 483, 488 [1974]), this decision was made easier by the compelling need for security in our schools. In my opinion, the governmental interest underlying this type of search is equal to if not greater than the interest justifying the airport and courthouse searches.
It is unfortunate that we have reached the point where so many of our great public institutions resemble medieval fortresses. Every day long lines of people wait at the magnetometers in our courthouse, sometimes forming a human moat *301 which snakes around the side of the building. This sight is a sobering reminder of the price we pay for security. But to envision students and teachers (or court personnel, litigants, and their families) huddled in fear as they attempt to go about their daily work is a far worse image. By adopting the guidelines, the Board of Education has taken a significant step in the battle to maintain peace and serenity in our schools. For recognizing the problem and seeking to address it in a responsible manner, the Board deserves our support and respect.