# CIRCUIT COURT OF THE CITY OF NORFOLK

Matthew Smith et al.

v.

Norfolk City School Board

July 29, 1998

Case No. (Chancery) C96-2087

BY JUDGE MARC JACOBSON

Plaintiffs Matthew Smith (Smith), James Allen DesRoches, II (DesRoches), and Graham Condon (Condon), all of whom sue by their next friends, are public high school students in the City of Norfolk. The Defendants are City of Norfolk School Board (Board); J. Frank Sellew, deputy superintendent; Joseph O'Brien, coordinator of security for the Norfolk Public Schools; Michael Spencer, principal of Maury High School (Maury); Michael Caprio, principal of Granby High School (Granby); Elmo W. Woodberry, Coordinator of Security at Maury; John Felton, Coordinator of Security at Granby; Courtney Smith, Earl Bryant (Bryant), and Lamont Walker (Walker), security officers at Maury; and Sheryl McAllister (McAllister) and Harry Times (Times), security officers at Granby. By agreement, named Defendants John Doe I and II, security officers at Maury, are no longer defendants in the instant case.

Plaintiffs challenge searches of students pursuant to the Board's Administrative Random Inspection Program and the Quick Reference Guidelines and Guidelines connected with the implementation of the Program (collectively referred to as "the Policy") and challenge whether school officials or their properly designated agents may stop or seize students pursuant to the Policy in order to scan them for the presence of metallic weapons. Plaintiffs

challenge the Policy facially, arguing that a student may not be stopped at random, scanned with a hand-held metal detector, or searched in areas in which the detector activates, unless school officials have an individualized, reasonable suspicion that the student is carrying contraband. Plaintiffs also assert that the Policy was applied unconstitutionally to each of them during six searches which took place during the 1996-97 school year. Each Plaintiff student challenges two searches. In so doing, Plaintiffs seek the following relief:

> A. A declaratory judgment that the policy of the plaintiffs [sic] in conducting searches of students and their purses and/or bookbags without any individualized or particularized suspicion is unlawful.
> B. An injunction prohibiting defendants from continuation of the policy and requiring particularized or individualized suspicion in conducting searches of students' persons or bags.

(Pls.' First Am. Compl. ¶ 10.)

The rights which Maury, Granby, and other affected schools in the City of Norfolk public school system afford their students regarding school searches are outlined in the Student Pamphlet which each student receives at the inception of the school year. The Policy reads in relevant part:

> You have the right to: Be safe and secure at school and pursue your education in a disciplined environment. Therefore, you and all your property will be subject to random administrative inspections, including those with metal detectors. Refusal to cooperate with a reasonable request may result in disciplinary action.

(Defs.' Ex. 1.)

Under the terms of the Policy, the choice of location for the use of the metal detectors at a given school is determined by the deputy superintendent of schools who chooses random numbers monthly and notifies the individual schools by electronic mail. At each school, the staff then uses these random numbers to determine which classroom, bus, or hallway will be searched by the inspection team.[1] *See* Quick Reference Guidelines at 1. The Quick Reference Guidelines specifically state that the school staff may not select the random number which determines the search sites. *See id.* at 2. The school

---

[1] For example, if the random number was "six," then every sixth classroom, every sixth bus, or every sixth hallway would be searched.

principal is required to send to the deputy superintendent, through the principal's coordinator of security, a request for the use of the metal detector. *See* Guidelines at 1. The schools must conduct searches at least three times a week to achieve the deterrent effect intended by the use of metal detectors. *See* Quick Reference Guidelines at 1-2.

Upon initiation of a search, the inspection team is required to place a sign (provided by the central office) in the vicinity of the search. *See id.* at 2. The sign states "Notice Administrative Inspection in Progress." Guidelines at 12. If possible, a scanning team of at least one male and one female conducts each search, and the principal or the principal's designee should be on hand to observe each search. *See id.* at 1.

Normally, the inspection team inspects all students at the selected site. *See id.* at 4. However:

> when necessary or deemed appropriate (e.g., inclement weather, emergencies, backlog of persons) the principal/Coordinator of Security may elect not to screen every person, change the ratio of persons randomly selected, or cancel the screening for that day.

*Id.* The Guidelines prescribe the method the principal or coordinator must use to ensure the selection of searched students is random.[2] *See id.* Inspection teams may not select a particular individual to be searched without a reasonable suspicion to believe the individual is in possession of a weapon or other unlawful item. *See id.*

Under the Guidelines, a student to be searched is instructed to place all bags or parcels on a table or desk and to remove all metal objects from his or her pockets prior to scanning. *See* Guidelines at 5. "If the detector is activated while scanning a bag or parcel, its owner will be requested to open the bag or parcel." *Id.* If contents of the bag obscure the inspector's view of the contents, the inspector is permitted to move the objects in the bag. *See id.*

If the detector activates on a student, the inspector instructs the student for a second time to remove all metal items from his or her pockets. If the detector activates again, the student is taken to a private area to be patted down by an inspector of the same sex. *See id.* Prior to the pat down, the student is asked once again to empty all metal items from his or her pockets. If the inspector "feels an object which may have activated the metal detector," the inspector

---

[2] The Guidelines give two choices to the principal or coordinator: (1) pick every $n$th student or (2) allow a preset number of students to enter without being screened and then resume screening.

requests the student, for a fourth time, to remove the item from his or her pocket. *Id.* If the student refuses, the inspector is permitted to remove the object. Under the Policy, the pat down may occur only in the area of the student's body which has caused the metal detector to be activated. *See* Guidelines at 5.

In asserting that the Policy is facially unconstitutional, Plaintiffs argue against the use and propriety of metal detectors in schools, whether portal or hand-held, without individualized suspicion for a given search or use of the detectors. (Pls.' Trial Br. at 3.) Specifically, Plaintiffs take issue with two guidelines of the metal detector policy:

(1) That requiring the students to stand spread eagle for scanning by hand-held detectors is unnecessarily intrusive; and

(2) That the failure to ask students to remove metal items from book bags and purses prior to scanning is unnecessarily intrusive.

Plaintiffs contend they should be allowed to remove metal items from the bags upon activation by a metal detector and, after doing so, to have the bag scanned again. Only if the detector activates again, Plaintiffs argue, should the party conducting the search be allowed to search the bag. The Plaintiffs allege that the Policy, as it is currently written, adopted, and implemented in the Norfolk school system, allows for searches which are violative of Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59 (Pls.' First Am. Compl. ¶ 3.2), as well as due process of law under Article I, § 11, of the Virginia Constitution (Pls.' First Am. Compl. ¶ 3.4).

Plaintiffs further assert that the Policy is unconstitutional as applied to them during the six searches in question. The Plaintiffs allege that the searches were conducted without probable cause or reason to believe that any contraband, dangerous materials, or incriminating objects or weapons would be found, thereby constituting unreasonable searches and seizures in violation of Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59 (Pls.' First Am. Compl. ¶ 3.1), and violating Plaintiffs' right to due process of law under Article I, § 11, of the Virginia Constitution (Pls.' First Am. Compl. ¶ 3.3).

The six searches which this Court must consider involved the following facts according to the record, the trial proceedings, briefs, and memoranda submitted by counsel for the parties. Five of the six searches involve scans with hand-held metal detectors; one search involves the use of a trained drug-sniffing dog.

*Two Searches Involving Plaintiff Smith*

Plaintiff Smith was a student at Maury at the time of the searches in question. The first search occurred approximately in September 1996, in a hallway at Maury. Smith was called over to a school official dressed in civilian clothes and known to Smith as Maury security officer Bryant. Bryant, holding a metal detector wand in his hand, approached Smith. Smith inferred he was going to be scanned and, as a result, put his hands in the air and spread his legs. The wand was passed over the front of his body without touching him. When the metal detector activated, Bryant gestured to Smith, and Smith inferred or assumed that Bryant was inquiring about the contents of his pockets. Smith then pulled out his car keys. About the time he pulled out his keys, Smith noticed that defendant Courtney Smith was looking in his book bag which was on his back. At trial, Smith testified that he was not able to see whether the bag had been scanned, but he denied hearing any activation beeps relating to the bag.

The second search involving Smith occurred in his Advanced Placement History Class approximately in October 1996. Defendants Bryant, Courtney Smith, and Walker entered the room and announced that they were conducting a random administrative search in accordance with the Policy. The class was divided into three sections, one for each officer. Walker approached Plaintiff Smith and asked him to stand. Smith declared that he was not going to be searched. Smith's teacher then asked if she could discuss the matter with Smith and spoke with him in the hallway outside the classroom. From this conversation, Plaintiff Smith understood that he would receive a ten-day suspension if he did not submit to the scan. He also understood that he would fail the semester if he had more than ten unexcused absences. The testimony was in conflict as to whether Smith emptied the contents of his book bag onto the floor or threw the closed bag at the feet of Defendants Bryant, Courtney Smith, and Walker. As Smith's person was scanned, he muttered certain profanities and was told to go out into the hallway. He remained there for approximately five minutes, during which time the search was completed. Afterward, Defendants Bryant, Courtney Smith, and Walker escorted Smith to the security office to discuss his use of profanities.

Witness Andrew Coyle testified that while Smith was in the hallway, a metal detector was placed against Smith's bag which had remained in the classroom, and his bag and wallet were opened. Plaintiff Condon testified that the detector "did not seem to activate." Defendant Bryant denied that the bag was ever scanned or searched. Bryant and Walker testified that the contents of

the bag were readily visible due to Smith's having dumped the bag's contents on the floor at their feet.

No contraband was found in either of the alleged searches of Smith.

### Two Searches Involving Plaintiff DesRoches

Plaintiff DesRoches was a student at Granby at the time of the searches in question. The first search occurred approximately in October 1996, in a hallway at Granby when officials passed a metal detector over DesRoches' body. DesRoches indicated at trial that he remembered very little regarding the details of this search. According to DesRoches, Defendant McAllister, holding a metal detector, stopped him in the hallway. In his deposition, DesRoches indicated that McAllister waved the wand in front of him and the detector activated in the area of his belt. DesRoches showed McAllister his belt buckle, and McAllister was satisfied. (Defs.' Ex. 9.) At the trial, DesRoches further testified that the wand activated on his pocket and that he was required to empty his pockets. (Trial Tr. at 202.) The wand also activated when McAllister scanned DesRoches' backpack. Following instructions, DesRoches opened his bag so Defendant McAllister and the other security officers present could look in the bag. The security officers were satisfied that the metal clip on DesRoches's clipboard had caused the activation. (*See* Defs.' Ex. 9.) DesRoches' trial testimony conflicted as to whether the metal detector activated; his testimony also indicated that he was not sure whether the security officers put their hands in his bag. (Trial Tr. at 206.) DesRoches testified that the security officer's actions took approximately five minutes.

At his deposition taken in February 1997, approximately four months after the incident, DesRoches described the search in question in some detail. (*See* Defs.' Ex. 9.) At trial, however, DesRoches described the search in a manner which varied markedly from his deposition testimony.

The second search occurred approximately one month later when DesRoches was again stopped in the hallway for a random administrative search. Defendant Times waved the wand in front of DesRoches' body, and the wand activated near his belt buckle. Times maintained that he did not scan DesRoches' person any further; however, DesRoches testified that Times "emptied [his] pockets" after the wand activated on one of them. The detector activated again when Times scanned DesRoches' book bag. Times instructed DesRoches to open the book bag. After indicating to Times that the clipboard was the metal item causing activation, DesRoches removed the clipboard from the bag. (*See* Defs.' Ex. 9.) Times scanned the book bag once again, and

thereafter, concluded the search. (*See id.*) This encounter lasted approximately five minutes. (*See id.*)

Again, DesRoches' testimony at his February 1997 deposition varied from his testimony at trial with regard to this second search. (Defs. Ex. 9.) At trial, DesRoches admitted he "remember[ed] bits and pieces" but did not recall any activation on his belt buckle during either search. (Trial Tr. at 212, 217.) However, he testified that he "[c]ould have sworn that [his] pockets had activated" during the second search. (Trial Tr. at 218.)

No contraband was found in either of the searches of DesRoches.

### Two Searches Involving Plaintiff Condon

Plaintiff Condon was a student at Granby at the time of the searches in question. The first search of Condon occurred approximately in September 1996, when security guards entered Condon's keyboard class to perform a random administrative search in accordance with the Policy. Without direction, Condon removed a pen and a key from his pockets to avoid activating the detector. When Defendant McAllister first scanned Condon's bag, the detector activated and Condon was asked to open his bag. Condon pulled out his notebook because he thought it was the item activating the scanner. After Condon removed the notebook, the wand did not activate on the bag again. McAllister then scanned the space around Condon's body, activating the detector in the area of Condon's belt buckle. Condon raised his shirt to show the buckle, and the search was concluded.

The second search of Condon occurred later in the fall of 1996. James Lee (Lee), now an acting dean of students at Booker T. Washington High School in Norfolk, was employed at Granby at the time of this search. Lee and Defendant Times entered Condon's Earth Sciences classroom and instructed all students to exit the classroom and to leave behind their belongings. After the students left, two City of Norfolk police officers brought in a drug-sniffing dog. Approximately ten minutes later, the students were instructed to re-enter the class room and to sit where they had been prior to exiting the classroom. Condon testified that when he returned to his desk, his gym clothes were strewn about outside of the bag, his personal effects had been moved all around, and his bag had dog saliva on it.

Lee testified that the book bag which the drug dog sniffed was later identified as that belonging to Condon. Further, Lee testified that the book bag was not open upon first observing the bag after the drug-sniffing dog had activated on it. After Condon returned to his desk, he was taken to the dean's office where Lee detected a strong odor of marijuana about Condon's jacket

and bag. Condon denied using marijuana, indicating that he had been in the presence of persons smoking marijuana prior to the search. After Condon was questioned further about the strength of the odor, he admitted that he had smoked marijuana that morning.

Lee attempted to secure consent from Condon to search his belongings. Condon stated that he wanted to wait for his mother to be present. Lee then indicated that he could turn Condon over to the police if Condon failed to cooperate with the request immediately. Condon agreed to the search. The thorough examination of his jacket included a search of the pockets, sleeves, and seams. Condon claims the search was done in the presence of a female, a claim which Lee denies. Condon emptied his pockets, pulled his pants legs up, and pulled his socks up tight.

No contraband was found on Condon.

Article I, § 11, of the Virginia Constitution provides, *inter alia*: "That no person shall be deprived of his life, liberty, or property without due process of law ... ." Va. Const., art. I, § 11.

Article I, § 10, of the Virginia Constitution provides:

> That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

The Virginia constitutional requirements, taken with Virginia Code § 19.2-59, which implements Article I, § 10, are "substantially the same as those contained in the Fourth Amendment." *Lowe v. Commonwealth*, 230 Va. 346, 348, n. 1, 337 S.E.2d 273, 274, n. 1 (1985) (quotations and citations omitted). The Fourth Amendment applies with equal force to the States and to the federal government. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (incorporating the Fourth Amendment into the Due Process Clause of the Fourteenth Amendment). The Fourth Amendment reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59, together with Virginia case law prohibiting unreasonable searches and seizures, clearly provide at least the same protection as the Fourth Amendment.

A. It is necessary for the Court initially to consider whether the Policy authorizes searches which implicate the Fourth Amendment and the Virginia Constitution before considering the reasonableness of metal detector scanning as a policy and as applied to the Plaintiff students. In particular, this Court must consider whether scanning with a hand-held metal detector constitutes a search. The Virginia Supreme Court has not dealt with the issue of administrative school searches specifically, but a substantial body of Fourth Amendment jurisprudence is helpful in considering the relevant issues in the instant case.

Many of the cases analyzing the use of metal detectors in Fourth Amendment jurisprudence involve airport and courthouse searches. For example, in *United States v. Epperson*, 454 F.2d 769 (4th Cir. 1972), the Fourth Circuit held that an airport search by a portal scanner, followed by a pat down after a second positive scan, was constitutionally valid where the government had a strong interest in preventing hijacking in the air. *See also United States v. Edwards*, 495 F.2d 799 (2d Cir. 1973) (upholding search by airport portal scanners); *United States v. Cyzewski*, 484 F.2d 509 (5th Cir. 1973) (upholding search by courthouse portal scanners); *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir. 1972) (upholding cursory search of attorney's briefcase prior to entrance of courthouse); *United States v. Slocum*, 464 F.2d 1180 (3d Cir. 1972) (upholding airport search by a portal scanner). In each of these cases, Federal Courts of Appeals have held that the use of a metal detector is a search within the meaning of the Fourth Amendment, thus likening a scan to the electronic frisk of a person. *See, e.g., Epperson*, 454 F.2d at 770 ("Indeed, the very purpose and function of a magnetometer [is] to search for metal and disclose its presence in areas where there is a normal expectation of privacy.").

However, the cases set forth in the preceding paragraph were decided prior to *United States v. Place*, 462 U.S. 696 (1983). In *Place*, the United States Supreme Court held that exposing luggage located in a public place to a trained canine did not constitute a search within the meaning of the Fourth Amendment. *See id.* at 707. While persons have a privacy interest in the contents of their luggage, the use of a dog:

does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information is limited. *This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.*

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.

*Place*, 462 U.S. at 707 (emphasis added).

Because metal detectors reveal the presence of both contraband and non-contraband metal items, they fall somewhere between canine sniffs and physical examinations. However, scanning with a hand-held device is more akin to the use of a trained canine. A magnetometer, such as the one involving the Plaintiff students in the instant case, reveals only the presence of metal. It would not reveal personal effects such as love letters, personal hygiene products, condoms, and other items about which Plaintiffs, in the argument presented during the trial of the case, showed seemingly heightened concern.

More significantly, the use of hand-held scanners involves no physical invasion of the person or the person's things to be searched. Rather, the metal detectors in the instant case were used only in the airspace surrounding the students and their belongings. The Virginia Court of Appeals, following the precedent set in *Place*, has held that the using a drug-trained canine to sniff the outside of a vehicle was not a search and did not require individualized, reasonable suspicion. *Brown v. Commonwealth*, 15 Va. App. 1, 421 S.E.2d 877 (1992). The Court explained:

*A reasonable expectation of privacy did not extend to the airspace surrounding appellant's vehicle,* and reasonable and articulable suspicion is not required before the police may use a canine trained in drug detection to sniff the air about an enclosure believed to contain drugs … . Nothing in the Fourth Amendment prohibits a law

enforcement officer from using trained canines to augment the sensory faculties bestowed on the officer at birth ... .

*Id.* at 6, 421 S.E.2d at 880-81 (emphasis added). The Court also noted that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* at 6, 421 S.E.2d at 881 (quotations and citation omitted).

Because the metal detector searches only the airspace surrounding students and their belongings, this Court concludes that a scan with a hand-held magnetometer is not a search for Fourth Amendment purposes.

B. Even if a scan with a hand-held device were, for the sake of argument, technically considered to be a search, it would not violate the Plaintiffs' constitutional rights. Generally, the Fourth Amendment speaks of the warrant requirement and the requirement of probable cause. "Ordinarily a search — even one that may permissibly be carried out without a warrant — must be based upon 'probable cause' to believe that a violation of the law has occurred." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1984) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973), and *Sibron v. New York*, 392 U.S. 40, 62-66 (1968)). However:

"probable cause" is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although "both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search ... in limited circumstances neither is required."

*Id.* (quoting *Almeida-Sanchez*, 413 U.S. at 277 (Powell, J., concurring)).

"[R]easonableness is still the ultimate standard." *United States v. Epperson*, 454 F.2d 769, 771 (4th Cir. 1972) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 539 (1966)). The reasonableness of a search is determined by balancing the governmental interest in conducting searches against the invasion of privacy which a search imposes. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968). Although in most cases some level of individualized suspicion is required, it is not the *sine qua non* of reasonableness, the ultimate Fourth Amendment test.

When an intrusion into privacy interests is minimal, the United States Supreme Court frequently has overlooked the Fourth Amendment requirements of warrants and probable cause or individualized suspicion. For

example, when all drivers (or a pre-set number of drivers) on a public road are detained for a short period of time and asked for their licenses, the Court does not require a warrant, probable cause, or any individualized suspicion. *See Michigan State Police v. Sitz*, 496 U.S. 444 (1990); *Delaware v. Prouse*, 440 U.S. 648 (1979); *see also Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985). Likewise, the Court has found that less than probable cause is needed for a search to be lawful when "special needs" exist "beyond the normal need for law enforcement ... ." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (citation omitted).

While schoolchildren have legitimate expectations of privacy, a balancing of those interests with the school's interest to preserve a proper educational environment "requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1984). Hence, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341. *T.L.O.* left open the issue of "whether individualized suspicion is an essential element of the reasonableness standard" in the context of school searches. *Id.* at 342, n. 8. Ten years later, the Supreme Court addressed this issue in *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995), by upholding suspicionless drug testing of student athletes.

Although *Vernonia* addressed searches of students who voluntarily chose to participate in school athletics, it is applicable in the school context generally. The compulsory nature of education does not distinguish *Vernonia* from the present case. The *Vernonia* Court noted, "Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State ... ." *Vernonia*, 515 U.S. at 654. The Court emphasized that "[t]he most significant element in this case is ... that the Policy was undertaken in the furtherance of the government's responsibilities, *under a public school system, as guardian and tutor of children entrusted to its care.*" *Id.* at 665 (emphasis added) (footnote omitted). Thus, *Vernonia*, by its very terms, speaks to all school settings.

The nature of the discipline and control needed in schools is what necessitates the relaxation of the constitutional proscription against stops and searches conducted without individualized suspicion. *See id.* at 653-57. School officials and their properly designated agents may temporarily detain or restrain students for a myriad of reasons. For example, a teacher may detain a group of students who are in the part of a classroom from which a paper airplane or other missile has been launched. This detention of the group is done even though no individualized suspicion exists and even though it could be said that the students are "seized" under traditional Fourth Amendment

analysis. *See California v. Hodari D.*, 499 U.S. 621 (1991) (holding that a person is seized upon the application of physical force or upon compliance with a show of authority).

In the school setting, utilizing appropriate discipline and control in order to build an environment conducive to learning is an important governmental interest. School officials dictate where a student will be at all times of the day. School officials dictate when a student can leave his or her designated room, bus, or hallway, as well as where a student must be at a given time. School officials dictate how much time a student has to get from one location to another. Thus, while school officials are state actors who must follow the Fourth Amendment, they have state-mandated authority to detain or restrain students and to control their behavior in the school setting. *See T.L.O.*, 496 U.S. at 336-37. This authority exists regardless of whether a school official suspects an individual student of wrongdoing, and relatively little due process is generally required. The permissibility of the teacher's actions in the example above would not be considered a violation of the students' constitutional rights. The "seizure" of the students in such a case would not violate the Fourth Amendment.

The Court concludes that an individualized suspicion is not necessary in order for the Policy to pass constitutional muster. As long as the Policy is reasonable without individualized suspicion, both facially and as applied, it is not unconstitutional. *See Vernonia*, 515 U.S. at 653-57; *T.L.O.*, 496 U.S. at 341. This Court notes that the aforementioned School Pamphlet, which all students including each of the Plaintiffs received at the beginning of the school year, clearly puts students on notice that they could be searched if they were to carry metal objects on their persons or in their bags. Students can adapt their choices of legitimate, noncontraband items that they bring to school accordingly.[3] To the extent that students bring metal items to school, they know they are possibly exposing themselves to a search. Moreover, once the metal detector activates on the student or the student's personalty, reasonable suspicion exists to examine the activated area to ensure that the student is not carrying a weapon.

In order to determine whether the Policy is reasonable, this Court must examine the constitutional requirements within the school setting. *Vernonia*

---

[3] For example, DesRoches testified that the metal clip on his clipboard always sets off the metal detector. DesRoches either could have carried the clipboard outside his book bag, or he could have utilized a board with a plastic clip which would not cause the magnetometer to activate.

adopted a three-part balancing test to evaluate the reasonableness of student searches.

The first factor is the nature of the privacy interest that society views as legitimate. *Vernonia*, 515 U.S. at 654. Schoolchildren are entitled only to those expectations of privacy and rights which are appropriate for school. For instance, the *Vernonia* Court stated:

> Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the "reasonableness" inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases.

*Id.* at 656. Children's expectations of privacy in school are generally lower than those in non-school settings:

> [School officials'] power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults. "A proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult."

*Id.* at 655 (quoting *T.L.O.*, 496 U.S. at 339).

The second factor which must be considered is the level of intrusion. *See id.* at 658. In the instant case, the hand-held scanners pinpoint a relatively precise place upon a student's body where metal is present. According to the Policy, the student is permitted to remove metal objects from his person prior to scanning, after which the scanning is less likely to activate on the student's person. Where activation does occur, the student is once again allowed to remove any metal objects. If the detector activates at this point, the precision of the hand-held unit allows for a limited pat down search of the student's person.[4]

---

[4] The testimony in the instant case suggested some departure from the Policy in at least one instance. For example, Plaintiff Smith was scanned and only afterward was allowed to remove the metal object which had caused the detector to activate. Although this departure should not have occurred, it was relatively slight.

An activation on a student's bag allows a school official to look inside the bag and sift through its contents only if the metal object is not immediately in sight. The search of an area closed from plain view might be considered intrusive under some circumstances in the school setting. However, any intrusion must be evaluated alongside students' reduced expectations of privacy, and it must be balanced against the governmental interest in maintaining the welfare and safety of students in public school. Additionally, as noted previously, all students are notified of the Policy at the beginning of the school year. Students may completely avoid having their bags opened by choosing a bag with non-metallic clasps, by not bringing metallic items to school, or by not placing metallic items in their bags.

The third factor is the governmental concern to which the Policy speaks. *See id.* at 660. The government has a strong interest in the welfare of its schoolchildren.[5] The school's first and foremost custodial and tutelary responsibility to the students is to keep them safe and out of harm's way, a responsibility which is essential so that the educational process may be effected and effective. Just as a school system requires students to verify that they have been properly vaccinated and have passed physical examinations in order to safeguard the health of the student body, by the same token, a school system, at the most basic level, must protect students from possible physical harm caused by the introduction of weapons into the school. This protection is basic to the educational process functioning in a proper and safe manner.

The school's duty to protect its students originates with students' parents who delegate the aspects of parental authority concerning restraint and discipline which are necessary for school officials to carry out the education of each child during the school day:

> Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination — including even the right of liberty in its narrow sense, *i.e.,* the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians .... When parents place minor children in private schools for their education, the

---

[5] *Vernonia* does not explicitly describe the level of the governmental interest which is necessary to outweigh the privacy interests at stake. However, the Court noted that the governmental interest there was "*important enough* to justify the particular search at hand, in light of other factors that show[ed] the search to be relatively intrusive upon a genuine expectation of privacy." *Vernonia,* 515 U.S. at 651 (emphasis in original).

teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them. In fact, the tutor or schoolmaster is the very prototype of that status.

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 654-55 (1995). In the public school context, the United States Supreme Court has rejected the notion that public schools have only parental power, which would not subject them to constitutional constraints. *See id.* at 655 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985)). Indeed, public school officials are state actors subject to constitutional restraints such as due process, free speech, and the Fourth Amendment. *See id.* (citing *T.L.O.*, 469 U.S. at 336). While public schools do not have such a degree of control that gives rise to a constitutional duty to protect:

> for many purposes school authorities act *in loco parentis* ... with the power and indeed the duty to inculcate the habits and manners of civility ... . *Thus, while children assuredly do not shed their constitutional rights ... at the schoolhouse gate ... the nature of those rights is what is appropriate for children in school. See, e.g., Goss v. Lopez*, 419 U.S. 565, 581-582 (1975) (due process for a student challenging disciplinary suspension requires only that the teacher informally discuss the alleged misconduct with the student minutes after it has occurred); *Fraser, supra*, at 683 (It is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse); *Hazlewood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (public school authorities may censor school-sponsored publications, so long as the censorship is reasonably related to legitimate pedagogical concerns) ... .

*Id.* at 655-56 (emphasis added) (internal quotations and parallel citations omitted).

According to the evidence in the instant case, Norfolk Public Schools confiscated thirty-one guns in the year preceding the institution of the Policy. From 1992 through 1996, while the Policy was in effect, the school system confiscated only three guns. This Court balances the privacy interest and the fairly limited intrusion which the Policy allows, against the strong and compelling governmental concern of keeping schools safe and protecting schoolchildren engaged in the education process from serious bodily injury and death.

After considering and balancing the three factors enunciated by *Vernonia*, the Court concludes that the Policy is facially constitutionally sound and the application of the Policy was not violative of the Plaintiffs' constitutional rights during the specific searches in question.

C. A traditional Fourth Amendment analysis would not alter the conclusions set forth above. *Delaware v. Prouse*, 440 U.S. 648 (1979), articulates the standard for whether a suspicionless search is constitutionally proper. There, the Court held that stopping vehicles for license checks and the like was unconstitutional unless either accompanied by reasonable suspicion[6] or performed pursuant to a plan designed to limit police discretion. *See id.* The Court in *T.L.O.* explicitly left open the applicability of *Prouse* to school searches by reserving the issue of whether an "individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities." *See New Jersey v. T.L.O.*, 496 U.S. 325, 342, n. 8 (1984). The Court noted with caution, however, that "[e]xceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field'." *Id.* (quoting *Prouse*, 440 U.S. at 654-55). In the present case, the detector searches were conducted without reasonable suspicion. Therefore, to pass the reasonableness test of the Virginia and United States Constitutions on a search requiring individualized suspicion, the discretion of the inspectors must be limited and the intrusion must be minimal.

In *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985), the Virginia Supreme Court interpreted *Prouse* in the context of driving under the influence checkpoints. There, the Court upheld the City of Charlottesville's checkpoint procedures, finding that the checkpoint's manual included:

> criteria for selection of a particular area for designation as a checkpoint site; provisions that a high-ranking police officer make the daily assignment of a previously designated site for operation of a roadblock and that such officer assign the personnel to work a particular roadblock; specific provisions for the manner in which a roadblock site should be manned and equipped; and detailed routine

---

[6] The standard of reasonable suspicion applies for conducting individualized searches of schoolchildren. *See New Jersey v. T.L.O*, 496 U.S. 325, 342 (1984).

for bringing traffic to a stop, interviewing motorists, and evaluation of an operator suspected of driving under the influence.

*Id.* at 351, 337 S.E.2d at 277.

In the present case, the City's revised policies are quite analogous to the *Lowe* criteria. The deputy superintendent is required to select a site number on a monthly basis. The school officials are strictly forbidden from picking this number. The principal, through the coordinator of security, picks whether certain rooms, hallways, or buses are to be searched and then sends a request for permission to carry out these searches to the deputy superintendent. The Guidelines specify the logistics of the search in great detail. *See* Guidelines at 10-11 (detailing the various stages of a search); *id.* at 13 (providing a flow chart of where inspection team members should be located and the manner in which the children should "flow" through). The Guidelines detail the procedures to be followed in the event of activation either on the students or on their belongings.

Together, these dictates severely limit the discretion of the inspection team and other school officials and avoid the constitutional infirmities the Virginia Supreme Court has outlined. The Court has indicated the following criteria are important to eliminate discretion: an explicit plan with neutral criteria, advance approval from a higher authority to conduct the checkpoints, and the elimination of discretion as to location or duration of the checkpoint. *See Simmons v. Commonwealth*, 238 Va. 200, 202-204, 380 S.E.2d 656, 658 (1989). The *Simmons* court, revisiting *Lowe* and *Prouse*, required checkpoints to "be undertaken pursuant to an explicit plan or practice which uses neutral criteria and limits the discretion of the officers conducting the roadblock." *Id.* at 204, 380 S.E.2d at 658-59.

The only discretion left to the principals and their designees under the Policy is to decide whether all students should be searched. The principals may choose to inspect only a set sample of students rather than all students at a site if efficiency dictates. *See* Guidelines at 4. This modicum of discretion left at the school level was approved in the first reported metal detector case, *People v. Dukes*, 580 N.Y.S.2d 850 (1992). *See People v. Pruitt*, 662 N.E.2d 540, 547 (Ill. 1996). The New York City policy was upheld even though the officers had the discretion to decide whether to search all of the students or limit the search by a random formula. *Dukes*, 580 N.Y.S.2d at 851. Like the present case, the school officers in *Dukes* were absolutely forbidden from picking any particular student to scan without an articulable, individualized, and reasonable suspicion. *See id.* at 850.

During the trial in the instant case, witnesses for the Board were questioned about the starting point of a random search under the Policy, suggesting that impermissible discretion in this regard might lie in the hands of the parties conducting a random search. However, Plaintiff students in the instant case neither complained nor suggested that any of the searches in question specifically were directed at any of the Plaintiff students and were not random searches of classrooms or hallways.

The solitary delegation to the inspection teams to decide whether all students will be searched, although reasonable under some circumstances, is subject to scrutiny if applied arbitrarily or improperly. At the planning stage, the amount of time required to search the students at a given time is difficult to predict. When approving the search, neither the deputy superintendent nor the school official requesting permission for the search is likely to have accurate knowledge of the number of students who will go through the particular hall or classroom or bus to be searched. Nor can the planners accurately estimate the time needed to search the students in the designated hallway, room, or bus.[7] Simply put, what may take fifteen minutes one day might take two hours on another day. The discretion of the inspectors must be limited so that the "individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field'." *New Jersey v. T.L.O.*, 496 U.S. 325, 342, n. 8 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654-55 (1979)). However, their discretion must not be so limited that the primary purpose of the searches — facilitating the students' ability to learn by ensuring their safety, as well as the safety of others — is impaired.

This Court concludes that even under a traditional Fourth Amendment analysis, the Policy does not violate the constitutional rights of Plaintiff students, either facially or as it was applied during the magnetometer searches in question; nor does the Policy violate the constitutional due process rights of the Plaintiff students. Because the intrusion of being scanned is minimal, and because the discretion of the inspectors is most limited, the Policy is consistent with the requirements of *T.L.O.* and *Prouse*.

D. Plaintiffs raise the issue of departure from the Policy in its application. Because part of the justification for the suspicionless searches is the limitation of discretion, adult searches in the checkpoint context can be valid only if performed wholly within the guidelines of the Policy. "To allow the

---

[7] For example, more students on a given day might need to be scanned more than once, or the inspectors may discover contraband on a student, thus requiring time to call the proper authorities and complete the disciplinary process.

[inspectors] to do anything short of complying in full with their own guidelines would inject an element of discretion into the checkpoint procedures and thus undercut the very foundation upon which the checkpoint seizure is constitutionally justified." *Brown v. Commonwealth*, 20 Va. App. 21, 25, 454 S.E.2d 758, 759 (1995) (quoting *Commonwealth v. Anderson*, 547 N.E.2d 1134, 1137-38 (1989)). Thus, under traditional Fourth Amendment analysis, any deviation from the Policy could result in a violation of Plaintiff students' constitutional rights.

The metal detector "searches" which are the subject matter of the instant suit reflect some departures from the Policy. For example, as discussed earlier, Plaintiff Smith was scanned before he was allowed to remove metal objects from his pockets. However, this Court is not prepared to enjoin the use of the entire Policy either because of or to avoid *de minimis* departures from the Policy. Because schoolchildren's constitutional rights must be tailored to fit the educational environment, the implementation of the Policy by school officials will not be automatically unconstitutional because of *de minimis* departures from the Policy. This would be true even under the traditional Fourth Amendment standard in the checkpoint cases.

Nonetheless, this Court does not condone such departures and notes that if they are continual or excessive, or they are not corrected, they will no longer be considered *de minimis* or insignificant. This Court should be mindful of the United States Supreme Court's admonition: "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint ... . By and large, public education in our Nation is committed to the control of local and state authorities." *Goss v. Lopez*, 419 U.S. 565, 578 (1975) (citation and quotations omitted). If this Court were to enjoin the school system in order to avoid even the most minor or insignificant deviations from the Policy, the Court would effectively be obliged to "supervise" every search which is challenged.

In addition to the students having less of a privacy interest in school than out of school, the role of school officials is different, for example, than the role of law enforcement officers carrying out sobriety checkpoints.

> The special relationship between teacher and student also distinguishes the setting within which schoolchildren operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils.

*Instead, there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.*

*T.L.O.*, 469 U.S. at 350 (Powell, J., concurring) (footnote omitted) (emphasis added). The Court in *T.L.O.* went on to say:

Unlike police officers, school authorities have no law enforcement responsibility or indeed any obligation to be familiar with the criminal laws. Of course, as illustrated by this case, school authorities have a layman's familiarity with the types of crimes that occur frequently in our schools: the distribution and use of drugs, theft, and even violence against teachers as well as fellow students.

*Id.* at 350, n. 1 (Powell, J., concurring).

Even though school security officers conduct virtually all of the searches under the Policy, there is neither indication nor evidence that the motivation of the security officers is not the same as other school authorities: to keep the students and all persons in a given school safe and out of harm's way in order to provide a safe and proper environment for the educational process. When a student does get hurt, it is the school system and security officers to whom everyone looks with the question: How and why? Given the nature of school officials' roles in conducting student searches and the more limited expectation of privacy that students have, any *de minimis* or insignificant departures from the Policy in the pleaded "searches," while not condoned as previously indicated, do not violate the constitutional rights of Plaintiff students, either under the school search cases or under traditional Fourth Amendment analysis.

E. In challenging the "dog sniffing" search of Plaintiff Condon, the Plaintiffs acknowledge that drug sniffing by a canine is not a search. (Pls.' Trial Br. at 31.) Their main contention is that the security guard's direction for Condon to leave his belongings behind after he was ordered to leave the room constituted an impermissible seizure of his bag and jacket. Condon asks this Court to declare this practice unconstitutional and to enjoin the "seizure" of personal effects without an individual, articulable suspicion.

Initially, it must be determined whether Condon's personal effects were "seized." In analyzing what constitutes "seizure of the person," the United States Supreme Court has examined the plain meaning of "seizure":

> From the time of the founding to the present, the word "seizure" has meant a "taking possession" .... For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control .... A res capable of manual delivery was not seized until "taken into custody." *Pelham v. Rose*, 9 Wall. 103, 106 (1870).

*California v. Hodari D.*, 499 U.S. 621, 624 (1991). Despite this traditional requirement of physical control, the Court in *Hodari D.* acknowledged that a person may also be seized either when an officer physically touches the person, regardless of whether the person is subdued, or when a person complies with an officer's show of authority. *See generally id.* at 626-29.

Although the law regarding the seizure of persons is clear, the law regarding inanimate objects is not. Prior to *Hodari D.*, the law on seizure of objects contained no "mere touch" exception to the general rule requiring an exercise of physical control. *United States v. Letsinger*, 93 F.3d 140, 143 (4th Cir. 1996), *cert. denied*, 117 S. Ct. 2437 (1997). "Likewise, the concept of seizure through a 'show of authority,' as in *Terry* and *United States v. Mendenhall* ... has never been expressly extended to objects." *Id.* The holding in *Letsinger* did not hinge on whether a complied-with show of authority constituted a seizure of an object, for the court concluded that the defendant there had relinquished his luggage to officers voluntarily. *See id.* at 144. The court noted in dicta, however, that it was possible for a complied-with show of authority to be a seizure of one's personal items. *See id.*

If, indeed, the *Hodari D.* test is equally applicable to the instant case, there may have been a seizure. Lee demanded that Condon relinquish possession of his bag and jacket. In further response to security officers' demands, Condon left the classroom.[8] Hence, the bag and the jacket were put within reach of the security officers by virtue of Condon's compliance with their show of authority. At the very least, seizure of an object is defined as a "meaningful interference with an individual's possessory interests in that [object]." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Condon argues that the instant

---

[8] Compliance with authority in this context means not only putting the tangible object down, but also surrendering the object completely. For example, it must mean something more than simply placing a bag on a table to be scanned. In such a case, the possessor technically would be complying with a show of authority; however, the compliance would not be accompanied by an intention to convey full domination and control.

case fits within this definition. (Pls.' Trial Br. at 31.) However, the "meaningful interference" which the *Jacobsen* Court evaluated was a law enforcement officer's exercise of control over a package of drugs by removing the drugs from a box. *See id.* at 120-21. The *Jacobsen* rule of meaningful interference could be interpreted as applying the common law rule requiring actual physical possession, the *Hodari D.* rule requiring merely a touch or a complied-with show of authority, or some other standard.

In dicta, the *Letsinger* court underscored the "meaningful interference with a possessory interest" test in *Jacobsen* as an extension of such "seizure of the person cases" as *United States v. Mendenhall*, 446 U.S. 554 (1980), and *Terry v. Ohio*, 392 U.S. 1 (1968). *Letsinger*, 93 F.3d at 144. Thus, while the concept of seizure through a show of authority has not expressly been extended to the seizure of objects, the *Jacobsen* court rooted its standard for the seizure of objects in seizure of persons jurisprudence. *See id. Hodari D.* and *Jacobsen*, both rooted in *Terry* and *Mendenhall*, support the *Letsinger* court's assumption that the show of authority test might extend to seizure of objects.

Having determined that Condon's bag was seized, that individualized suspicion is not a requirement where the governmental concern with weapons is as compelling as it is in the instant case, and that the Policy would not be unconstitutional even if subjected to the more rigorous scrutiny of adult checkpoint jurisprudence, this Court concludes that the brief detention of a student's property, under the Policy and the Quick Reference Guidelines and Guidelines, is not unconstitutional. *T.L.O.* acknowledged the twin dangers of violence and drugs in public schools. *See New Jersey v. T.L.O.*, 496 U.S. 325, 339 (1984). Deterring drug use by students is a compelling governmental interest that goes beyond merely maintaining order and security in the schools.

> Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in *Von Raab* [upholding drug tests of Customs Service employees without individualized suspicion] ... or deterring drug use by engineers and trainmen, which was the governmental concern in *Skinner* [upholding drug tests of railroad employees without individualized suspicion] ... . School years are the time when the physical, psychological, and addictive effects of drugs are most severe ... . And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 661-62 (1995) (citations omitted).

In this case, Condon's privacy interest is less than that of an adult or a person in a non-school setting for the reasons set forth above. In addition, the level of intrusion on him was relatively slight or insignificant. Even though there was a brief detention of Condon's bag, the bag was not opened outside the presence of Condon. Instead, the bag was merely sniffed by the canine unit. At that point, Condon was brought into the room, then escorted with his bag to the office. The school officials waited until he was in their presence to open the bag. As soon as the dog hit upon the book bag, the school officials had probable cause to open the bag with or without Condon's presence. *See, e.g., Brown v. Commonwealth*, 15 Va. App. 1, 6-7, 421 S.E.2d 877, 882 (1992). The fact that school officials waited until Condon was present and attempted to obtain consent from him to search indicates that due regard was given to his subjective expectations of privacy. Balancing Condon's lessened privacy interests and the minimal intrusion upon them against the strong governmental concerns with drugs and guns, this Court concludes that Condon's rights were not violated by the brief seizure of his belongings.

The use of a police dog to complete the search does not change the analysis. In the present case, the school officials initiated and directed the dog sniffing. The mere use of the drug-sniffing police dog as an instrumentality does not remove the present case from the analysis in *T.L.O.* and *Vernonia*. Hence, Condon's constitutional rights were not violated.

For the reasons set forth above, this Court finds and holds that the Policy of the Board is constitutional both facially and as applied in the six "searches" complained of by the three Plaintiff students. The Court finds and holds that the Policy, including the Quick Reference Guidelines and Guidelines permitting searches of students and their purses and book bags without any individualized or particularized suspicion, does not violate the constitutional rights of the Plaintiff students and that the Policy as adopted and implemented is not violative of Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59 or Article I, § 11, of the Virginia Constitution.

The six searches in question did not constitute unreasonable searches or seizures. The five magnetometer scans in question, even if they were considered searches, were not violative of the Plaintiff students' rights under the Fourth Amendment or under Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59; nor were they violative of the Plaintiff students' rights to due process of law under Article I, § 11, of the Virginia Constitution. The use of a drug-sniffing dog as applied in the instant case was not a search, and the seizure of the student's bag which followed was not unconstitutional

either under Article I, § 10, of the Virginia Constitution and Virginia Code § 19.2-59 or under Article I, § 11, of the Virginia Constitution.

Accordingly, Plaintiff students are entitled neither to the declaratory judgment nor to the injunctive relief sought in the "Prayer for Relief," and such relief is denied.